Deborah A. Sivas (Calif. Bar No. 135446)
Leah J. Russin (Calif. Bar No. 225336)
Carolyn Bills (Certified Law Student)
Edmund J. Gorman, Jr. (Certified Law Student)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
Crown Quadrangle
559 Nathan Abbott Way
Stanford, California 94305
Telephone: (650) 725-8571
Facsimile: (650) 723-4426
dsivas@stanford.edu
leahrussin@law.stanford.edu

Andrea A. Treece (Calif. Bar No. 237639)
CENTER FOR BIOLOGICAL DIVERSITY
1095 Market Street Suite 511
San Francisco, California
Telephone: (415) 436-9682
Facsimile: (415) 436-9683
atreece@biologicaldiversity.org

Attorneys for Plaintiff Center for Biological Diversity

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>MICHAEL CHERTOFF, in his official capacity as Secretary of the U.S. Department of Homeland Security, REAR ADMIRAL PAUL F. ZUKUNFT, in his official capacity as Commander of U.S. Coast Guard District Eleven, and UNITED STATES COAST GUARD,<br><br>　　　　　Defendants. | Case No. 08-CV-02999 MMC<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Date:** October 3, 2008<br>**Time:** 9:00 a.m.<br>**Judge:** Hon. Maxine Chesney<br>**Courtroom:** Ctrm. 7, 19th Flr. |

1

## NOTICE OF MOTION

2       PLEASE TAKE NOTICE that at 9:00 a.m. on October 3, 2008, or as soon thereafter as

3   the matter may be heard in the Honorable Judge Maxine M. Chesney's courtroom of the United

4   States District Court for the Northern District of California, 450 Golden Gate Avenue, San

5   Francisco, California, Plaintiff, Center for Biological Diversity, will move this Court pursuant to

6   Federal Rule of Civil Procedure 56 and Civil Local Rules 7-2, 7-4, and 56 for summary

7   judgment on its Claim for Relief in its Complaint.  This motion is based on the accompanying

8   Memorandum of Points and Authorities, the Declarations of Andrea Treece, Brendan

9   Cummings and Douglas Bevington, the pleadings, records and files in this action, and other

10  such documentary and oral evidence that may be supplied at the hearing.

11      For the reasons set forth in the accompanying Memorandum of Points and Authorities,

12  the continuing failure of Defendants, Michael Chertoff, Secretary of the U.S. Department of

13  Homeland Security, Rear Admiral Paul F. Zukunft[1], Commander of U.S. Coast Guard District

14  Eleven, and the United States Coast Guard, to consult with the National Marine Fisheries

15  Service regarding the impacts of Defendants' regulation of ship traffic off the coast of California

16  on threatened and endangered whales and other species violates the requirements of section

17  7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2).  Plaintiffs seek

18  declaratory and injunctive relief to remedy this violation, including an order requiring

19  Defendants to complete ESA section 7 consultation.

20

21

22

23

24

25

26

27

28

---

[1] Rear Admiral Paul F. Zukunft took command of District 11 from Rear Admiral Craig E. Bone on August 7, 2008.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**


**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................... 1

II.    STANDARD OF REVIEW ............................................................................ 2

III.    LEGAL FRAMEWORK ............................................................................... 2

   A.    The Endangered Species Act ................................................................... 2

   B.    The Ports and Waterways Safety Act ...................................................... 4

IV.    FACTUAL BACKGROUND ........................................................................ 5

   A.    Increasing Numbers of Blue Whales Are Being Killed in Santa Barbara Channel ............ 6

   B.    Ship Traffic Affects Endangered Species Along the California Coast ................................ 7

   C.    The Coast Guard Has Not Consulted Regarding its Control of Ship
Traffic .................................................................................................... 8

V.    ARGUMENT ............................................................................................... 11

   A.    The Coast Guard's Actions Regarding Ship Traffic Are Agency Actions That Trigger
Consultation ........................................................................................ 11

      1.    The Coast Guard Has Exercised the Authority Vested in It by the PWSA to Regulate
Ship Traffic Off the California Coast……………………………………………12

      2.    The Coast Guard's Regulation of Ship Traffic Constitutes Agency Action That   Has
Ongoing Impacts……………………………………………………………13

   B.    The Coast Guard Has Statutory Authority to Benefit Endangered Species .................... 14

   C.    The Coast Guard's Actions May – and Do -- Affect Endangered Species ........................ 15

   D.    New Information About Whale Mortalities Requires Consultation ................................. 16

VI.    CONCLUSION ........................................................................................... 17

1

# TABLE OF AUTHORITIES

2

**Cases**

3

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).......................................................2

4

5

California Sportfishing Prot. Alliance v. Fed. Energy Regulatory Comm'n, 472 F.3d 593
     (9th Cir. 2006) ...................................................................................................................12

6

City of Sausalito v. O'Neill, 386 F.3d 1186 (9th Cir. 2004) ...........................................15

7

8

Defenders of Wildlife v. Gutierrez, 2008 U.S. App. LEXIS 15294 (D.C. Cir. July 18, 2008)........
     ...........................................................................................................................................12, 13

9

Envtl. Prot. Info. Ctr. v. Simpson Timber Co., 255 F.3d 1073 (9th Cir. 2001)............................14

10

Mt. Graham Red Squirrel v. Madigan, 954 F.2d 1441 (9th Cir.1992) ....................................16

11

Nat'l Ass'n of Home Builders v. Defenders of Wildlife 127 S. Ct. 2518 (2007)...........................3

12

Natural Resources Defense Council v. Houston, 146 F.3d 1118 (9th Cir. 1998)....................3, 15

13

Pac. Coast Fedn. of Fishermen's Ass'ns v. U.S. Bureau of Reclamation, 2006 U.S. Dist. LEXIS
     24893 (N.D. Cal. March 27, 2006)..........................................................................................16

14

15

Pacific Rivers Council v. Thomas, 30 F.3d 1050 (9th Cir. 1994) ..........................................3, 13

16

Sierra Club v. Babbitt, 65 F.3d 1502 (9th Cir. 1995) .......................................................14

17

Sierra Club v. Marsh, 816 F.2d 1376 (9th Cir. 1987) .......................................................16

18

Tennessee Valley Authority v. Hill, 437 U.S. 153 (1978) .......................................................2

19

20

Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv., 340 F.3d 969 (9th Cir. 2003)
     ...........................................................................................................................................3, 14

21

Washington Toxics Coalition v. Envtl. Prot. Agency, 413 F.3d 1024 (9th Cir. 2005)................14

22

**Statutes**

23

16 U.S.C. § 1531(b) ...................................................................................................................2

24

16 U.S.C. § 1536(a) ................................................................................................................3, 4

25

16 U.S.C. § 1536(b) ...................................................................................................................4

26

16 U.S.C. § 1536(c)……………………………………………………………………...15

27

16 U.S.C. § 1540(f)..................................................................................................................15

28

16 U.S.C. § 470f ...................................................................................................13

33 C.F.R. § 161.1(b) .............................................................................................5

33 C.F.R. § 167.15(a) ...........................................................................................5

33 C.F.R. § 167.5(b) .............................................................................................5

33 U.S.C. §§ 1221(a)-(b) ..................................................................................4, 15

33 U.S.C. § 1222(1) .............................................................................................4

33 U.S.C. § 1223(a) ......................................................................................4, 5, 12

33 U.S.C. § 1223(c) ....................................................................................5, 10, 12

33 U.S.C. § 1224(a) .......................................................................................5, 15

33 U.S.C. §§ 1231(a)-(b) .....................................................................................5

42 U.S.C. § 4321 *et seq.* .....................................................................................13

**Regulations**

33 C.F.R. § 1.05-1 ..............................................................................................12

50 C.F.R. § 402.01 ...............................................................................................3

50 C.F.R. §§ 402.02-402.03 ..................................................................................3

50 C.F.R. § 402.14 ........................................................................................3, 4, 15

50 C.F.R. § 402.16 ...........................................................................................3, 16

**Rules**

Fed. R. Civ. P. 56(c) ............................................................................................2

Fed. R. Civ. P. 56(e) ............................................................................................2

**Other Authorities**

35 Fed. Reg. 18,319 (Dec. 12, 1970) ...............................................................6, 8

64 Fed. Reg. 32,451 (June 17, 1999) .................................................................9

65 Fed. Reg. 31856 (May 19, 2000) .............................................................9, 13

65 Fed. Reg. 46603 (July 31, 2000)..............................................................10, 13

65 Fed. Reg. 53911 (Sept. 6, 2000).................................................................9, 13

1

65 Fed. Reg. 62292 (Oct. 18, 2000).................................................................10, 13

2

65 Fed. Reg. 67249 (Nov. 9, 2000)...........................................................................13

3

67 Fed. Reg. 49578 (July 31, 2002)..........................................................................13

4

E.O. 13175……………………………………………………………………………13

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.    INTRODUCTION

All too often, endangered whales are killed by collisions with ship traffic off the California coast without any analysis of how these deaths may affect the species as a whole. The area's ecological richness and its proximity to major ports make it a magnet for whales and ship traffic alike. Whales rely on these waters to provide critical food sources and migratory corridors. For instance, blue whales, the largest mammals on earth and among the most imperiled, congregate off the coast in the summer and fall to feed on concentrated swarms of krill. Humpback, sei, sperm, and the nearly extinct North Pacific right whale also inhabit these waters. In increasing numbers, ships use the same area en route to and from major West Coast ports. Unfortunately, the combination has proven deadly for too many whales. Whales near the surface are vulnerable to massive, fast-moving commercial ships that may not even be aware of their presence. Unable to escape the path of those giant vessels, whales are struck, injured, and killed as they surface for breath, feed, travel and rest near the surface.

As the federal agency that regulates and directs the considerable vessel traffic off the California coast, the United States Coast Guard ("Coast Guard") must insure, through consultation with the National Marine Fisheries Service ("NMFS"), that its actions will not jeopardize blue whales and other protected species as required by the Endangered Species Act ("ESA"). Yet the Coast Guard has never consulted with NMFS regarding its control of shipping traffic and the effects on whales and other listed species in the waters off of California.

The unprecedented number of endangered blue whales killed by ship strikes in the Santa Barbara Channel in 2007 presents a vivid example of the harm wrought by the Coast Guard's failure to comply with its duties under the ESA. Ship traffic in the Santa Barbara Channel, which leads to the Los Angeles and Long Beach ports, is among the busiest in the world, and poses a known threat to the survival and recovery of a number of endangered whale species. In 2007 alone, ship collisions are known to have killed at least three blue whales in the Santa Barbara Channel; it is likely that even more unreported or undetected deaths and injuries occurred. These whales belonged to a population so imperiled that the death of just one of them could be sufficient to prevent the population's recovery. If ships continue to kill blue whales at

the rate observed in 2007, the species' survival and recovery will become increasingly unlikely.

Despite this threat, the Coast Guard has failed to fulfill its non-discretionary duty under the ESA to ensure that ship traffic does not jeopardize the blue whale or any other endangered whale species. Until the Coast Guard completes consultation with NMFS and undertakes actions necessary to avoid jeopardy to these species, ships will continue to strike and kill endangered whales in the shipping lanes off the coast of California.

Plaintiff Center for Biological Diversity seeks an order compelling the Coast Guard to initiate and complete consultation with NMFS regarding the effects of its regulation of ship traffic on blue whales and other endangered and threatened species in the waters off the California coast. Such relief is necessary to prevent illegal agency action and forestall irreparable injury to protected species.

## II.     STANDARD OF REVIEW

Summary judgment should be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Where the moving party has demonstrated that there is no material issue of fact for trial, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## III.     LEGAL FRAMEWORK

### A.     The Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*.

Congress enacted the ESA to provide "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b). The Supreme Court has explained that "the plain intent of Congress . . . was to halt and reverse the trend toward species extinction, whatever the cost." Tennessee Valley Authority v. Hill, 437 U.S. 153, 184 (1978).

The National Marine Fisheries Service has primary responsibility for implementing the goals and ideals of ESA with regards to most marine species, including whales and other marine

1   mammals and sea turtles.  50 C.F.R. § 402.01(b).[2]  Each federal agency must consult with

2   NMFS whenever their actions "may affect" listed marine species to "insure that any action

3   authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued

4   existence of any endangered species or threatened species. . . ."  16 U.S.C. § 1536(a)(2) (section

5   7 consultation requirement); see also 50 C.F.R. § 402.14.

6          This consultation requirement applies to all discretionary "activities or programs of any

7   kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United

8   States or upon the high seas," including granting rights-of-way.  50 C.F.R. §§ 402.02-402.03;

9   See Nat'l Ass'n of Home Builders v. Defenders of Wildlife 127 S. Ct. 2518, 2536 (2007)

10  (holding that section 7(a)(2) consultation is required for all discretionary agency actions).

11  Agency action "has been defined broadly" for purposes of triggering section 7 consultation.

12  Natural Resources Defense Council v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998).  ESA

13  consultation is required whenever the action agency has discretion that can "inure to the benefit

14  of protected species."  Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv., 340

15  F.3d 969, 974, 977 (9th Cir. 2003).  Agencies must consult regarding the impacts not only for

16  one-time actions, but also for actions that are continuing in nature or effect, such as the

17  promulgation of plans that will guide future actions.  Pacific Rivers Council v. Thomas, 30 F.3d

18  1050, 1053 (9th Cir. 1994) (actions with "an ongoing and long-lasting effect even after

19  adoption" represent ongoing agency action and trigger consultation requirements of section 7.).

20  Furthermore, if new information regarding the species or the impact arises after completion of

21  consultation on an action with continuing impacts, the action agency must reinitiate formal

22  consultation with NMFS or FWS, as appropriate.  50 C.F.R. § 402.16.

23         Consultation is intended to protect listed species by allowing NMFS's biological experts

24  to evaluate the risk of any proposed action by another agency (in this case the Coast Guard), and

25

26  [2] The ESA vests primary responsibility for administering and enforcing the statute with the
    Secretaries of Commerce and Interior.  The Secretaries of Commerce and Interior have
27  delegated this responsibility to NMFS (within the National Oceanic and Atmospheric
    Administration) and the U.S. Fish and Wildlife Service ("FWS") respectively.  50 C.F.R. §
28  402.01(b).

impose appropriate mitigation where necessary, or prohibit the action altogether if the risk to the survival and recovery of the species is too great. As part of formal consultation, NMFS issues a biological opinion articulating its consideration, analysis, and ultimate determination regarding whether the agency action is likely to jeopardize the continued existence of the species or destroy or adversely modify its critical habitat. 16 U.S.C. §§ 1536(a)(2) and (b)(3)(A); 50 C.F.R. § 402.14. When NMFS determines that an action will result in the "take" (harm or killing) of any endangered or threatened species as defined by the ESA, it may grant the action agency an incidental take statement authorizing such take —if it imposes mitigation requirements that would prevent the agency action from reducing the likelihood of the species' survival and recovery. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14.

**B.    The Ports and Waterways Safety Act, 33 U.S.C. § 1221 et seq.**

The Ports and Waterways Safety Act ("PWSA") empowers the Coast Guard to regulate navigation within the jurisdiction of the United States, including in the waters off the California Coast. Congress further specified that the Coast Guard is responsible for the protection of the marine environment in the exercise of its authority under the PWSA. 33 U.S.C. §§ 1221(a)-(b) ("navigation and vessel safety, [and] protection of the marine environment . . . are matters of major national importance;" "increased vessel traffic in the Nation's ports and waterways creates substantial hazards to life, property, and the marine environment."). The PWSA defines the marine environment to include all "navigable waters of the United States and . . . resources therein and thereunder" and "waters and fishery resources of any area over which the United States asserts . . . authority." 33 U.S.C. § 1222(1).

Under the authority of the PWSA, the Coast Guard has continuing discretion to regulate marine vessels through several broad and overlapping statutory directives. First, the Coast Guard is authorized to operate and maintain "vessel traffic services," which include a variety of measures for controlling vessel traffic to protect "navigation and the marine environment," including reporting and operating requirements, surveillance and communication systems, routing systems, and fairways. 33 U.S.C. § 1223(a)(1). Once established, a vessel traffic service controls the movement of vessels in order to minimize the risk of "damage to property or

the environment." 33 C.F.R. § 161.1(b).  Second, the PWSA provides that the Coast Guard "shall designate necessary fairways and traffic separation schemes [("TSS")[3] for vessels operating in the territorial sea of the United States. . . ." 33 U.S.C. § 1223(c)(1).  Third, the Coast Guard is authorized to control vessel traffic in hazardous areas by establishing routing limits, speed limits, and other operating limitations. 33 U.S.C. § 1223(a)(4).  Fourth, after TSSs and other measures have been established, the PWSA authorizes the Coast Guard to continuously adjust the location or limits of a TSS, in part to accommodate other uses.  33 U.S.C. § 1223(c)(5)(C); 33 C.F.R. § 167.15(a).  Finally, the statute requires the Coast Guard to promulgate implementing regulations and grants continuing authority to amend or repeal those regulations. 33 U.S.C. §§ 1231(a)-(b).

The PWSA requires that the Coast Guard, in its exercise of discretion, "take into account all relevant factors concerning navigation and vessel safety, [and] protection of the marine environment," including "any other potential or actual conflicting activity" and "environmental factors." 33 U.S.C. § 1224(a).  Thus, Congress granted the Coast Guard discretion to control, through regulation and rules, the movement of ships off the California Coast, continuing discretion to adjust and suspend those regulations and rules as needed, and finally, the mandate to protect wildlife, including endangered marine mammals.

## IV.    FACTUAL BACKGROUND

The waters off the California coast provide a busy byway for whales and ships alike. Since 2000, more than a dozen whales have been struck and injured or killed by ships traveling along the California coast.  Declaration of Andrea A. Treece ("Treece Decl."), Ex. A (NMFS, Large Whale Ship Strike Database (January 2004)); see also Declaration of Brendan Cummings ("Cummings Decl."), Ex. D (NMFS, Resp. to Petition from CBD to Implement Emergency Regs. in So. Cal. to Protect Blue Whales (Jan. 8, 2008)) at 2.  The alarming number of blue whales killed in the Santa Barbara Channel in 2007 alone amply demonstrates the significant

---

[3] A Traffic Separation Scheme is a "designated routing measure which is aimed at the separation of opposing streams of traffic by appropriate means and by the establishment of traffic lanes." 33 C.F.R. § 167.5(b).

1    effect that ship traffic has on this and other endangered species.

2       **A.    Increasing Numbers of Blue Whales Are Being Killed in the Santa Barbara**
3            **Channel.**

4       Every year, thousands of large vessels travel up and down the California Coast, and

5    through the Santa Barbara Channel, using the traffic separation scheme implemented by the

6    Coast Guard.  The Santa Barbara Channel is also within essential habitat for a number of

7    endangered and threatened whales; it is a prime feeding ground and part of their migratory

8    route.  The overlap of these shipping lanes with the foraging habitat and migratory routes of

9    whales puts these endangered species at great risk.  See Cummings Decl., Ex. D at 2.  The

10   convergence of ships and whales has resulted in injury and mortality.

11      The blue whale (*Balaenoptera musculus*) has been listed as endangered under the ESA

12   since 1970.  35 Fed. Reg. 18,319 (Dec. 12, 1970); Fed. Def. Answer to Complaint ("Answer")

13   ¶26.  It is the largest animal known to have ever lived on earth.  Once numbering over 300,000,

14   the global blue whale population has been reduced by commercial whaling to likely fewer than

15   10,000 individuals.  Blue whales off California are part of the Eastern North Pacific Stock, and

16   the current best population estimate for the Eastern North Pacific Stock is 1,186 animals.

17   Treece Decl., Ex. B (NMFS, Stock Assessment for the Blue Whale Eastern North Pacific Stock

18   (Oct. 30, 2007)) at 177.

19      Blue whales usually pass through the Santa Barbara Channel during their migration.

20   Historically, ships have regularly, if relatively infrequently, hit and injured or killed these

21   whales off the California coast.  According to the most recent stock assessment report, "ship

22   strikes were implicated in the deaths of blue whales in 1980, 1986, 1987, 1993, 2002, and

23   2004."  Id. at 179.  Importantly, the total number of whales killed and injured by ships may far

24   exceed the reported numbers for any given year:  NMFS reports that "[g]iven the fact that large

25   vessel operators often do not detect the impact of striking a whale, animals may be hit and

26   passed over without observation.  Likewise, operators may be aware of a strike, but choose not

27   to report it. . . . [I]t is highly likely that far more collisions are occurring than are actually

28   reported."  Treece Decl., Ex. C (NMFS, "Large Whale Strikes Relative to Vessel Speed") at 3.

PL'S MOTION FOR SUMMARY JUDGMENT & MEMO. IN SUPPORT          08-CV-02999 MMC

NMFS has determined that the Eastern North Pacific Stock of blue whales can withstand no more than one non-natural death per year in U.S. waters while still reaching its optimum sustainable population.  Treece Decl., Ex. B at 177.

Last year, large numbers of blue whales remained in the Santa Barbara Channel longer than usual, keeping them in the middle of some of the busiest shipping lanes in the world well into the fall.  Perhaps as a result of the whales' extended stay in the channel (where the shipping traffic is controlled by the Coast Guard), at least three blue whales were killed by ships in the fall of 2007 alone.  Cummings Decl., Ex. D at 2.  Between September 8 and September 19, 2007, federal agencies received reports of five sightings of dead blue whales in the area extending from Santa Cruz Island to immediately north of San Diego.  Another dead adult female, accompanied by a very young animal, also dead, washed ashore on San Miguel Island on November 29, 2007.  Necropsies of these dead whales revealed that they were likely killed as a result of collisions with ships.  Id.

NMFS has issued a recovery plan for the blue whale which identified ship collisions as a significant threat to the species in the Pacific.  Treece Decl., Ex. D (NMFS, Recovery Plan for the Blue Whale (July 1998)) at 15, 24.  The recovery plan recommends specific steps to aid in the recovery of the blue whale, including: "Identify areas where ship collisions with blue whales might occur, and areas where concentrations of blue whales coincide with significant levels of maritime traffic or pollution," and "Identify and implement methods to reduce ship collisions with blue whales."  Id. at 24.  The recovery plan concludes that "[i]mplementation of appropriate measures designed to reduce or eliminate such problems are essential to recovery."  Id.  Because the Coast Guard has failed to consult with NMFS, NMFS has not had the opportunity to implement these measures in a take statement or biological opinion.  As a result, blue whales and other endangered whales face a continuous threat from ship traffic regulated by the Coast Guard.

### B.    Ship Traffic Affects Endangered Species Along the California Coast.

While the death of blue whales in the Santa Barbara Channel provides a recent and stark illustration of the threat posed by ship traffic, blue whales are not at risk only in that area, nor

are they the only species affected by ship traffic off California. The Coast Guard's regulation of ship traffic affects blue whales and a number of other protected whales (and even sea turtles) in the waters along the entire California Coast. The humpback whale migrates and lives in the waters off the California Coast and is impacted by the Coast Guard's actions. The humpback whale (*Megaptera novaeangliae*), like the blue whale, has been listed as "endangered" under the ESA since 1970. 35 Fed. Reg. 18,319 (Dec. 12, 1970); Answer at ¶30. The Eastern North Pacific stock of humpback whales, which travel through the Santa Barbara Channel en route to and from their calving grounds further south, has been reduced to just over 1,300 individuals. Treece Decl., Ex. E (NMFS, Stock Assessment Report for Eastern North Pacific Stock of Humpback Whales (Nov. 1, 2005)) at 167. NMFS has determined that the number of non-natural deaths that the stock can incur while still reaching or maintaining its optimal sustainable population is 2.3 animals per year in U.S. waters. Although less than that number are usually reported dead from ship collisions, more humpback whales are likely killed or injured by ship strikes than are reported. Id. at 168. Humpbacks tend to stay in coastal waters and avoid the open sea, particularly mothers returning from the breeding grounds with their young. This characteristic makes them especially vulnerable. Indeed, it is the second most common species of whale to be killed as a result of collisions with ships.

Other protected species also occur off the California Coast, Answer at ¶36, and are impacted by the shipping traffic here. These species, including the sei whale (*Balaenoptera borealis*), the sperm whale (*Physeter macrocephalus*), and the North Pacific right whale (*Eubalaena japonica*), are similarly threatened by shipping traffic. In recent years, numerous unidentified whales have been killed in the waters off the coast of California. Cummings Decl., Ex. A. The Coast Guard's implementation of the Santa Barbara Channel TSS and other shipping regulations off the California Coast put these species at greater risk of collisions with ships.

**C.    The Coast Guard Has Not Consulted Regarding its Control of Ship Traffic.**

The Coast Guard, particularly District 11, has exercised its authority under the PWSA to regulate the considerable ship traffic off the California coast for many years. California ports

welcome cargo ships laden with imports from around the globe and send other cargo ships out with exported domestic goods.  Oil tankers travel up and down the coastline using Coast Guard-regulated shipping lanes.  These massive vessels travel to the ports of San Francisco, Oakland, and Richmond in San Francisco Bay, as well as San Diego, Los Angeles, and Long Beach in southern California.  Answer at ¶24.  The Ports of Los Angeles and Long Beach are the most active of any U.S. ports, with thousands of large vessels arriving each year.  Answer at ¶23; Treece Decl., Ex. F (American Association of Port Authorities, 2005 World Port Rankings).  The Santa Barbara Channel is among the busiest shipping lanes in the world.  Id.

Though the Coast Guard controls and regulates shipping off the California coast, it has never formally consulted with NMFS regarding the impacts of ship traffic to protected species.  Three traffic separation schemes ("TSSs") off the California coast have been adopted by the International Maritime Organization ("IMO").  The IMO adopted TSSs off San Francisco and in the Santa Barbara Ship Channel in 1968 and 1969, respectively.  A third TSS abutting the Santa Barbara Channel in the approaches to Los Angeles-Long Beach was adopted in 1975.  64 Fed. Reg. 32,451, 32,452 (June 17, 1999) (discussing the history of the Santa Barbara Ship Channel TSS).  Since that time, the Coast Guard has repeatedly adjusted these TSSs and other vessel traffic control measures in accordance with its authority under the PWSA.  See, e.g., id. at 32452-53 (discussing history of California coast port access route studies and TSS adjustments through 1999); see also Answer at ¶38-40 (implementation of TSSs and changes to them).  In 2000, the Coast Guard published the results of a port access route study ("PARS") for the approaches to Los Angeles-Long Beach, resulting in a number of recommended changes to existing vessel routing and traffic management measures.  65 Fed. Reg. 31856, 31857 (May 19, 2000) (PARS results); 65 Fed. Reg. 53911 (Sept. 6, 2000) (final rule implementing changes to TSS in approaches to LA-Long Beach); 65 Fed. Reg. 62292 (Oct. 18, 2000) (final rule making changes to San Pedro Regulated Navigation Area).  In the same year, the Coast Guard also promulgated amendments to the TSSs off San Francisco and in the Santa Barbara Channel to route commercial vessels farther offshore and thus farther from the Monterey Bay National Marine Sanctuary.  65 Fed. Reg. 46603 (July 31, 2000).

The Coast Guard has continued to implement the Santa Barbara Channel TSS and others off the California Coast.  Answer at ¶40.  The Coast Guard continually reviews the TSSs, advises vessel traffic of its location and constraints, monitors and coordinates vessel traffic, and carries out enforcement activities with respect to vessel traffic. Id.; see also 33 U.S.C. §1223(c)(5)(C) (authorizing Coast Guard to "adjust the location or limits of designated fairways or traffic separation schemes, in order to accommodate the needs of other uses which cannot be reasonably accommodated otherwise"); Treece Decl., Ex. G (U.S. Coast Guard, Sector San Francisco Vessel Traffic Service User's Manual (March 2005)) (overview of vessel traffic service and Coast Guard traffic management off San Francisco).

The Coast Guard also promulgates a weekly "Local Notice to Mariners" advising shipping traffic of hazards and redirecting shipping traffic as needed.  Treece Decl., Ex. H (U.S. Coast Guard Dist. 11 Local Notice to Mariners for the 44th week of 2007 (Oct. 31, 2007)) (issuing directive to vessel traffic to "exercise caution and operate at a safe speed when traveling through the channel and in and out of Los Angeles and Long Beach Harbors" due to presence of whales;[4] and to separately to avoid area of capsized barge) and Ex. I (U.S. Coast Guard Dist. 11 Local Notice to Mariners for the 32nd week of 2008 (Aug. 6, 2008)) (advising vessel operators of possible presence of blue whales in Santa Barbara Channel and advising them to "exercise caution.").  Notably, the Coast Guard has not formally consulted with NMFS to determine whether it should adjust the location or limits of the TSS to accommodate endangered species, despite its knowledge of their presence and vulnerability.

In addition to its failure to consult regarding the location and regulation of the shipping lanes, the Coast Guard has also failed to consult regarding vessel speed in the channel.  The lack

---

[4] When the presence of whales became known in 2007, the Coast Guard and other agencies issued broadcast notices to mariners asking them to voluntarily slow down.  Cummings Decl., Ex. B.  Compliance with the Coast Guard's request is unknown, as is its effectiveness.  While the advisory recognized the potential harm to whales from vessel traveling at high speed, it fell far short of ESA section 7's requirement to seek NMFS's opinion on whether the Coast Guard's regulation of ship traffic jeopardized these and other species, and what measures might be necessary to avoid such jeopardy.

PL'S MOTION FOR SUMMARY JUDGMENT & MEMO. IN SUPPORT          08-CV-02999 MMC

of speed limits or other effective traffic control measures within the Santa Barbara Channel TSS

increases the risk to whales from ships:

> [S]hips operating at reduced speed may be less likely to impose strong
> hydrodynamic forces on whales which otherwise might pull whales into the path
> of a ship. Additionally, slower vessel speeds may give a whale more time to
> detect, react and avoid a vessel. Finally, collision at a slower speed results in less
> actual impact (physical force) to the whale and to the vessel. This may spell the
> difference between mortality and less serious injury for the animal. . . . Therefore,
> NOAA Fisheries recommends that speed restrictions in the range of 10-13 knots
> be used, where appropriate, feasible, and effective, in areas where reduced speed
> is likely to reduce the risk of ship strikes and facilitate whale avoidance.

Treece Decl., Ex. C. Finally, although the Coast Guard adjusts its control of ship traffic

constantly, it does so without the guidance that would be provided by consultation with NMFS.

## V.     ARGUMENT

The Coast Guard's failure to engage in ESA section 7 consultation regarding the effects

of its regulation of ship traffic along the California coast contravenes the statute's plain and

unremitting requirements. The Coast Guard's promulgation and continued implementation of

TSSs off California are indisputably agency actions that may – and do – affect a number of

endangered whales and other listed species. The Coast Guard is well aware that alarming

numbers of endangered whales have been injured and killed by collisions with ships, and has the

discretion under the PWSA to alter its regulation of ship traffic in order to protect these species

from further harm. Despite these facts, the Coast Guard has never engaged in section 7

consultation. Its refusal to do so further imperils blue whales, humpbacks, and other species that

the ESA was enacted to protect.

### A.     The Coast Guard's Actions Regarding Ship Traffic Are Agency Actions That Trigger Consultation.

The Coast Guard's regulation of ship traffic in the Santa Barbara Channel and off the

California Coast falls squarely within the ESA's definition of agency action triggering

consultation. The Coast Guard fulfills its duties to control vessel traffic, including its location,

speed, and avoidance of hazards, through its affirmative exercise of continuing discretionary

authority under the PWSA. With this exercise of discretionary authority comes the non-

1    discretionary duty to ensure through section 7 consultation that the Coast Guard's actions do not

2    jeopardize species protected under the ESA.

3          **1.**      **The Coast Guard Has Exercised the Authority Vested in It by the**

4                    **PWSA to Regulate Ship Traffic Off the California Coast.**

5          As explained above, the PWSA vests authority in the Coast Guard to regulate ship traffic

6    within U.S. waters, including the promulgation, review, and alteration of traffic separation

7    schemes, establishment of speed limits, and other measures to control vessel traffic.  33 U.S.C.

8    §§ 1223(a) and (c).  While the International Maritime Organization plays an advisory role in

9    regulating U.S. ship traffic, "the Coast Guard is the sole body charged with the duty of

10    promulgating traffic separation schemes."  Defenders of Wildlife v. Gutierrez, 2008 U.S. App.

11    LEXIS 15294, *37 (D.C. Cir. July 18, 2008), citing 33 U.S.C. §1223(c)(1) and 33 C.F.R. § 1.05-

12    1.

13          The Coast Guard's regulation of ship traffic is a collection of affirmative actions

14    exercising its discretionary authority.  See California Sportfishing Prot. Alliance v. Fed. Energy

15    Regulatory Comm'n, 472 F.3d 593, 595 (9th Cir. 2006) (ESA section 7 consultation

16    requirement is triggered by affirmative actions).  The Coast Guard affirmatively issues

17    regulations directing ships where to go, what to avoid, and in some circumstances, imposes

18    speed limits and other limitations on traffic.  The Coast Guard has exercised its authority to

19    regulate ship traffic in numerous ways.  As summarized above, the Coast Guard amended the

20    TSS in the approach to Los Angeles-Long Beach, an action that implemented changes the Coast

21    Guard had recommended after conducting a port access route study for the area.  65 Fed. Reg.

22    31856, 31857 (May 19, 2000) (publication of PARS results); 65 Fed. Reg. 53911 (Sept. 6, 2000)

23    (final rule implementing changes to TSS in approaches to Los Angeles-Long Beach); 65 Fed.

24    Reg. 62292 (Oct. 18, 2000) (final rule making changes to San Pedro Regulated Navigation

25    Area).  Similarly, the agency exercised its authority by amending the TSSs in the Santa Barbara

26    Ship Channel and off San Francisco to protect sanctuary resources.  65 Fed. Reg. 46603 (July

27    31, 2000).  These are precisely the type of affirmative agency actions recognized by courts to

28    require consultation.  In fact, the D.C. Circuit Court of Appeals recently found that conducting

port access route studies and publishing the results, accepting comments on proposed TSS routes, and the publication of TSSs were "final agency actions" triggering the ESA section 7 consultation requirement.[5] Defenders of Wildlife v. Gutierrez, U.S. App. LEXIS 15294 at *41-43.

Since promulgating the TSS amendments, the Coast Guard has taken affirmative actions to implement the TSSs by advising oceangoing vessels on the location of the TSSs through vessel traffic services and notices to mariners (see, e.g., Treece Decl., Ex. G); continually monitoring the TSSs for hazardous conditions, including environmental hazards (see, e.g., 67 Fed. Reg. 49578 (July 31, 2002) (temporary rule establishing safety zone in the Gulf of the Farallones offshore of San Francisco)); and issuing alerts to mariners using vessel traffic services (Cummings Decl., Exs. I and J). As explained below, these continuing actions to implement TSSs and other vessel traffic measures pursuant to the PWSA trigger ESA section 7 consultation.

> **2.    The Coast Guard's Regulation of Ship Traffic Constitutes Agency Action That Has Ongoing Impacts.**

The Coast Guard's regulation of shipping traffic has "ongoing and long-lasting effect even after adoption," and is continuous in nature. Therefore, the Coast Guard must engage in section 7 consultation even now. Like the forest management plans involved in Pacific Rivers Council v. Thomas, the Coast Guard's promulgation of TSSs and other ship traffic management

---

[5] The issue whether the promulgation and implementation of vessel traffic control measures are agency actions has implications for a number of important environmental and cultural protections even from outside the ESA realm. For example, this determination could ensure that the Coast Guard undertakes the appropriate environmental review of its actions under the National Environmental Policy Act as well as tribal consultation with ocean-going tribes such as the Tongva Ancestral Territorial Tribal Nation whose vital cultural interests are affected by the Coast Guard's regulation of ship traffic in ancestral areas. See, e.g., 42 U.S.C. § 4321 et seq. (National Environmental Policy Act); 16 U.S.C. § 470f (National Historic Preservation Act, tribal consultation); E.O. 13175 re Consultation and Coordination With Indian Tribal Governments, 65 Fed. Reg. 67249 (Nov. 9, 2000). As the D.C. Circuit noted, "[b]y giving the Coast Guard authority to promulgate traffic separation schemes, Congress intended to make the Coast Guard accountable for them." Defenders of Wildlife v. Gutierrez, U.S. App. LEXIS 15294 at *38.

measures off the California coast has effects "extending far beyond their mere approval." 30 F.3d 1050, 1053 (9th Cir. 1994) (finding Long Range Management Plans for National Forests to be "ongoing agency action" because they govern every individual project implemented in the forest); Washington Toxics Coalition v. Envtl. Prot. Agency, 413 F.3d 1024, 1033 (9th Cir. 2005) (section 7 consultation was required for the registration of insecticides under the Federal Insecticide, Fungicide, and Rodenticide Act, even after registration occurred if no consultation was done initially, because EPA retained continuing authority to alter or cancel those registrations). The Coast Guard's decisions in this regard govern where and how ships travel off the California coast long after a given traffic measure is adopted and the Coast Guard retains discretion to alter those measures to accommodate legally authorized aims such as environmental protection. Because the Coast Guard's actions regarding shipping traffic have ongoing effects, they are continuing agency actions to which the consultation requirements of section 7 apply. The Coast Guard must consult with NMFS regarding the impacts of these actions on endangered species.

## B.    The Coast Guard Has Statutory Authority to Benefit Endangered Species.

The PWSA "confers sufficient discretion" on the Coast Guard "to benefit listed species." See Turtle Island Restoration Network, 340 F.3d at 977; see also id. at 974 ("the discretionary control retained by the federal agency must have the ability to inure to the benefit of a protected species") (citing Envtl. Prot. Info. Ctr. v. Simpson Timber Co., 255 F.3d 1073 (9th Cir. 2001)). In Turtle Island, the Ninth Circuit explained that ESA consultation requirements could be triggered only by agency actions taken pursuant to the authority of a statute that allowed the agency to protect listed species (otherwise, the consultation would be meaningless since the agency would not be able to alter its action based on the consultation). Id. at 974-75 (citing Sierra Club v. Babbitt, 65 F.3d 1502, 1509 (9th Cir. 1995)). Here, the Coast Guard's regulation of shipping traffic is undertaken pursuant to the PWSA, which explicitly provides that the Coast Guard is to protect the marine environment. 33 U.S.C. §§ 1221(a)-(b) ("navigation and vessel safety, [and] protection of the marine environment . . . are matters of major national importance;" "increased vessel traffic in the Nation's ports and waterways creates substantial

PL'S MOTION FOR SUMMARY JUDGMENT & MEMO. IN SUPPORT          08-CV-02999 MMC

1    hazards to life, property and the marine environment."); <u>see also</u> 33 U.S.C. § 1224(a)(6)

2    (requiring the Coast Guard to consider "environmental factors" in carrying out its duties under

3    the PWSA).  Moreover, the ESA itself contemplates that the Coast Guard will alter its actions

4    for the protection of listed species.  16 U.S.C. § 1540(f) (authorizing the Coast Guard "to

5    promulgate such regulations as may be appropriate to enforce" the Act).  Thus, the Coast

6    Guard's actions pursuant to its PWSA authority trigger consultation requirements.

7          **C.**      **The Coast Guard's Actions May – and Do – Affect Endangered Species.**

8          The Coast Guard's implementation of the TSSs off the California Coast and ancillary

9    activities carried out under the PWSA have resulted in the death of numerous listed whales and

10    continues to threaten blue whales, humpbacks, and other species present in these waters.  "If an

11    agency determines that its proposed action 'may affect' an endangered or threatened species, the

12    agency must formally consult with the relevant Service."  <u>Natural Resources Defense Council v.</u>

13    <u>Houston</u>, 146 F.3d at 1125; 50 C.F.R. § 402.14.  The threshold question in determining whether

14    a particular agency action "may affect" a listed species is whether "an endangered or threatened

15    species may be present in the area of the proposed action."  <u>City of Sausalito v. O'Neill</u>, 386

16    F.3d 1186, 1215 (9th Cir. 2004) (citing 16 U.S.C. § 1536(c)(1) (regarding the biological

17    assessment that precedes or accompanies consultation)).  Here, the ships abiding by the Coast

18    Guard's regulations in the past have encountered, sometimes fatally, listed endangered and

19    threatened species, including the blue whale.  Further, the blue whale, the sei whale, the

20    humpback whale, and other listed species migrate up and down the California coast each year

21    and thus are present in the area affected by the Coast Guard's action.  Cummings Decl., Ex. A;

22    Answer at ¶¶32, 36.  The Coast Guard's action thus "may affect" endangered marine mammals

23    and other species.

24          Formal consultation with NMFS with respect to the Coast Guard's regulation of ship

25    traffic in shipping lanes off the California coast would insure that the implementation of the

26    shipping regulations does not interfere with the survival and recovery of protected species.  Ship

27    strikes are always harmful and often fatal to whales.  Because the Coast Guard is engaged in

28    ongoing affirmative agency action within the Santa Barbara Channel and elsewhere along the

PL'S MOTION FOR SUMMARY JUDGMENT & MEMO. IN SUPPORT        08-CV-02999 MMC

California coast, it is required to consult with NMFS to determine necessary mitigation to reduce or eliminate the detrimental impacts of these actions on endangered whales.

Notably, NMFS has already spelled out some actions the Coast Guard could take pursuant to the PWSA and ESA consultation which would protect species. As NMFS has recognized, setting speed limits is an important step toward reducing whale deaths from vessel traffic in the Santa Barbara Channel and elsewhere. Treece Decl., Ex. C. Designating parts of the channel as "hazardous" when whales are sighted in the TSS, advising vessels of the locations of whales in the channel, or installing monitoring buoys that detect the presence of whales and alert vessel traffic of their presence are additional measures the Coast Guard is authorized to implement under its existing PWSA authority that could protect endangered whales. Thus, the Coast Guard's actions regulating shipping traffic can and do affect protected species, and consultation could and would protect them.

**D.      New Information About Whale Mortalities Requires Consultation.**

The information about increased incidence of blue whale mortalities during the fall of 2007 is the type of information which would ordinarily trigger "reinitiation" of consultation had the Coast Guard ever formally consulted with NMFS regarding its shipping traffic regulations off the California Coast. 50 C.F.R. § 402.16; Sierra Club v. Marsh, 816 F.2d 1376, 1387-88 (9th Cir. 1987) (agencies have a continuing duty under section 7(a)(2) to gather and evaluate new information concerning the environmental impact of its actions); Mt. Graham Red Squirrel v. Madigan, 954 F.2d 1441, 1445 (9th Cir.1992) ("The duty to consult is ongoing."); see Pac. Coast Fedn. of Fishermen's Ass'ns v. U.S. Bureau of Reclamation, 2006 U.S. Dist. LEXIS 24893, *16-17 (N.D. Cal. March 27, 2006) ("new information" requiring the agency to reinitiate consultation included a fish kill of a greater size than anticipated in the original consultation). The Coast Guard's failure to consult in the first place, in light of the new information about potentially changing conditions, heightens the need for a formal consultation now in order to prevent further injury to blue whales, other protected species, and Plaintiff's interests.

## VI.    CONCLUSION

For all the foregoing reasons Plaintiff respectfully requests that the Court grant its Motion for Summary Judgment, and: (1) declare the Coast Guard to be in violation of section 7(a)(2) of the ESA for failing to enter into and complete consultation on the impacts of the TSSs in the Santa Barbara Channel, the approach to Los Angeles-Long Beach, and off San Francisco, and all other Coast Guard measures related to vessel traffic management off the California Coast, on the blue whale and other threatened and endangered species; (2) order the Coast Guard to initiate Section 7 consultation regarding the impacts to threatened and endangered species from Coast Guard regulation of ship traffic off the California coast; and (3) order the Coast Guard to implement such measures as necessary and proper to cease the endangerment of whales from vessel traffic until consultation with NMFS has been completed.

Dated:  August 26, 2008                    Respectfully submitted,


         /s/ Andrea A. Treece
Andrea A. Treece
CENTER FOR BIOLOGICAL DIVERSITY
351 California Street, Suite 600
San Francisco, California 94104
Phone:  415-436-9682
Facsimile:  415-436-9683
E-mail:  atreece@biologicaldiversity.org