Deborah A. Sivas (Calif. Bar No. 135446)
Leah J. Russin (Calif. Bar No. 225336)
Carolyn Bills (Certified Law Student)
Edmund J. Gorman, Jr. (Certified Law Student)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
Crown Quadrangle
559 Nathan Abbott Way
Stanford, California 94305
Telephone: (650) 725-8571
Facsimile: (650) 723-4426
dsivas@stanford.edu
leahrussin@law.stanford.edu

Andrea A. Treece (Calif. Bar No. 237639)
CENTER FOR BIOLOGICAL DIVERSITY
1095 Market Street Suite 511
San Francisco, California
Telephone: (415) 436-9682
Facsimile: (415) 436-9683
atreece@biologicaldiversity.org

Attorneys for Plaintiff Center for Biological Diversity

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation,; <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL CHERTOFF, *et al.*,; <br><br> Defendants. | CASE NO.:  3:08-cv-02999-MMC <br><br> **DECLARATION OF BRENDAN CUMMINGS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> **Date:** October 3, 2008 <br> **Time:** 9:00 a.m. <br> **Judge:** Honorable Maxine M. Chesney <br> **Courtroom:** Courtroom 7, 19th Floor |

I, Brendan Cummings, declare as follows:

1.     I am a member of the Center for Biological Diversity ("the Center"). I am also on staff at the Center and serve as the Director of its Oceans Program. The Center is a non-profit conservation organization with offices in San Francisco and elsewhere in the United States. The Center has over 40,000 members, including many members who live in California. The Center's members and staff, including myself, rely on the Center to represent our interests in the preservation of imperiled species and habitats, including the blue whale and other marine species occurring off the coast of California.

2.     As Director of the Center's Oceans Program, I analyze a variety of public and private actions in and affecting the world' oceans, including actions in the waters off California. I work with our legal and scientific staff and other organizations to advance the Center's goal of ocean wildlife and habitat protection through administrative actions and reform, scientific research, and, where necessary, litigation. In my capacity at the Center, I am familiar with all aspects of the Center's activities and organizational interests related to the world's oceans and the California coast in particular.

3.     The Center has a strong interest and long history of involvement in the protection of the imperiled marine species off the California coast. Our involvement has ranged from submitting petitions to have species listed under the Endangered Species Act (ESA), commenting on fisheries management plans and proposals for the construction of LNG facilities and port expansions, and in certain instances bringing litigation to protect ESA-listed species from harmful activities such as longline and gillnet fisheries. I believe our current work to reduce the impacts of ship traffic on endangered whales falls squarely within our organizational interests and mission.

4.     The Center's current advocacy over the Coast Guard's responsibilities regarding shipping lanes and the ESA began in September 2007 when I received a call from a scientist on a sailboat who had just come across a dead blue whale in the Santa Barbara Channel. At least two other dead blue whales had been found in the previous two weeks in the same general area, with one having been determined to have likely been killed as a result of a ship strike, and the other disposed of before cause of death could be determined.

5.     Following the necropsy of this third whale, which indicated that it too had likely been killed by a ship, I drafted a petition for emergency rulemaking and submitted it to the National Marine

Fisheries Service (NMFS) on September 25, 2007.  The petition requested that NMFS utilize its authorities under the ESA to promulgate a rule setting a speed limit of 10 knots for large vessels in the Santa Barbara Channel until blue whales left the area for the year.  A true and correct copy of the petition is attached as Exhibit A to this declaration.

6.      On October 4, 2007 the Center sent an action alert to its members requesting that they send an email or letter to NMFS and the Coast Guard requesting the agencies impose a 10 knot speed limit in the Santa Barbara Channel to protect blue whales.  Over 7000 Center responded to the alert and sent emails to these agencies.  Subsequently, on October 10, 2007 the Coast Guard issued a press release summarizing its response to the blue whale situation.  While the Coast Guard recommended that vessels in the Santa Barbara Channel not exceed 10 knots, the Coast Guard did not impose any actual speed limit.  Attached as Exhibit B to this declaration is a true and correct copy of the Coast Guard's press release, which I downloaded from http://www.uscgsanfrancisco.com/go/doc/823/177687/ on October 10, 2007.

7.      Research by the Center determined that, to the best of our knowledge, the Coast Guard has never consulted on the impacts of designation and management of shipping lanes off California on any ESA-listed species.  Consequently, on November 8, 2007 the Center sent a 60-day notice of intent to sue to the Coast Guard regarding the agency's failure to engage in section 7 consultation under the ESA on the impacts of designating and operating shipping lanes off California on ESA-listed species, primarily the blue and humpback whales.  A true and correct copy of the notice letter is attached as Exhibit C to this declaration.  The Center never received a response from the Coast Guard regarding the notice letter.

8.      On January 8, 2008 NMFS sent a response to the Center's petition for an emergency rulemaking.  NMFS indicated that it would not initiate such a rulemaking at this time.  A true and correct copy of the petition response is attached as Exhibit D to this declaration.

9.      On June 18, 2008 the Center filed this suit against the Coast Guard over the agency's failure to consult on it designation and management of shipping lanes off California on ESA-listed species.

10.      In addition to the Center's strong organizational interests in the protection of endangered

whales, I have a strong personal and professional interest in these species. I rely upon the Center to represent these interests. Other staff of the Center, as well as many of the organization's members whom I have met, share my interest in species such as the blue whale as well as a concern for their fate. The harming of this species, as well as of other marine mammals such as humpback whales, significantly impairs the Center and its members' interests in protecting, observing and appreciating these species.

11.    My first major involvement in the world of marine mammal conservation was in 1987, when I served as crew on a research and conservation vessel documenting the impacts of high seas driftnets on marine mammals. I spent a month at sea cruising across the North Pacific to the Aleutian Islands and the Bering Sea in search of marine mammals and the fishing vessels that were killing them. On this voyage, I saw numerous marine mammal species, including Dall's porpoise, harbor porpoise, Pacific white-sided dolphins, Baird's beaked whales, humpback whales, orcas, Steller's sea lions, California sea lions, northern fur seals, elephant seals, harbor seals and sea otters.

12.    Since my trip in 1987 to observe and document marine mammals, I have continued to seek out such species and, where necessary, advocate on their behalf. In 1988, I again was crew on the same vessel, traveling from Vancouver, Canada to Santa Cruz, California observing marine mammals. I also briefly worked on a similar vessel based in Long Beach, California in 1992. On each of these voyages, seeing, and if possible, helping protect, marine mammals was the primary purpose. The highlight of all my travels and vacations is seeing wildlife, particularly marine mammals. Even when I do not actually see a given species, the knowledge that it still exists and that, if I am patient and lucky, I may see it, gives me great pleasure. The fact that various marine mammals are threatened with extinction troubles me greatly and I fear that in the future I may not have the chance of seeing them.

13.    In the years since these voyages, I have gone on numerous whale watching trips. I continue to take such trips several times a year. I have gone whale watching from San Francisco, Moss Landing, Monterey, Ventura, Long Beach, and San Diego, California, as well as from Alaska, Washington, Hawaii, and Florida in the U.S., and in other countries such as Mexico and Australia. My most recent whale watching trip was in June 2008 from Seward, Alaska. On that trip I saw humpback whales, orcas, Dall's porpoise, Steller sea lions, harbor seals and sea otters. My next such trip will be

1   next week when I am in Iceland.

2       14.     Specific to the California coast, I went on three whale watching trips in 2007 (from San

3   Diego, Ventura and Long Beach), and once so far in 2008 (from Long Beach). My next such trip is

4   scheduled for late September when I will go on a trip out of Long Beach looking for blue whales.

5       15.     While seeing any species of whale is a highlight of such trips, seeing a blue whale is a

6   special treat as these are the largest animals that have ever lived. In recent years their numbers have

7   rebounded from depletion from commercial whaling, and the California coast is now one of the best

8   locations in the world for seeing this species. I never tire of seeing blue whales. Through about 2005,

9   blue whales consistently arrived in Monterey Bay in the summer to feed. Every year from 2001 to 2006

10  I went whale watching in Monterey Bay primarily to see blue whales. However, the past couple of

11  years, likely due to changing ocean conditions, blue whales have congregated in much fewer numbers in

12  Monterey Bay and instead have been more abundant in southern California, particularly in the Santa

13  Barbara Channel. While this has made them easier to see from southern California, it also means that

14  rather than feeding in the relative safety of Monterey Bay, the animals now congregate in an area that is

15  also one of the busies shipping lanes in the world.

16      16.     Last year, the overlap of a blue whale feeding area and the shipping lanes in the Santa

17  Barbara Channel highlighted to me the need for better regulation of shipping to take into account its

18  impacts on marine mammals, particularly endangered species such as the blue whale. While the blue

19  whale is the largest animal on earth, it is still dwarfed by a container ship. And while the species is

20  recovering from previous overharvest, its future is by no means secure. My understanding from

21  reviewing stock assessment reports is that NMFS considers the human-caused death of more that one

22  blue whale a year sufficient to impede the recovery of the California population. Unfortunately, ship

23  strikes are now likely undermining such recovery.

24      17.     The deaths of several blue whales last year due to ship strikes are very troubling to me.

25  This unusual mortality event is likely a harbinger of similar tragedies, as ship traffic increases and

26  migratory behaviors shift in response to the global warming of the oceans. It should inspire the Coast

27  Guard and NMFS to take their legal obligations under the ESA seriously and work together to minimize

28  the risk of ship strikes to whales in California waters. Unfortunately, by failing to engage in section 7

consultation, the Coast Guard is not doing all that it can to protect blue whales, and by extension, my and the Center's interest in these magnificent animals.

18.     I believe that consultation under the ESA will help protect blue whales from shipping, and increase the chances that the species will persist in the wild in coming years.  I believe that if the blue whale is not properly protected under the ESA, then it is more likely to suffer substantial population declines and to ultimately become extinct.  If blue whale populations decline or become extinct, I will suffer in a number of ways.  I will suffer a loss of psychological and spiritual well-being, from knowing that blue whales were in decline and/or are extinct.  I would suffer a professional, aesthetic, spiritual and recreational loss from my inability to observe and appreciate these animals in the wild, and because my enjoyment of the marine environment is diminished when animals are missing from the ecosystem.

19.     Given my and the Center's interests in protecting blue whales and other imperiled marine species, I believe that the ESA should be complied with and enforced.  The fact that the Coast Guard has never carried out any consultation on its designation and management of shipping lanes off California is troubling.  Such review can have a significant positive impact on the species at issue.  For example, the review NMFS carried out on the California drift gillnet fishery as a result of a Center lawsuit resulted in the requirement of seasonal area closures to deflect fishing effort from areas where there was a high likelihood of entanglement with protected species.   However similar protective measures, such as speed limits, will not occur in this case until and unless the Coast Guard complies with the ESA by carrying out a consultation with NMFS on the impacts of shipping lanes on blue whales and other ESA-listed species.  I believe that a court order requiring the Coast Guard to carry out this process is a necessary first step towards protecting the blue whale and other imperiled species, and my and the Center's interests in them.

I declare under penalty of perjury that the foregoing is true and correct and was executed on August 20, 2008 at Joshua Tree, California

/s/ Brendan Cummings
_____
Brendan Cummings

1       I, Andrea A. Treece, pursuant to ECF General Order 45X.B, attest that Brendan Cummings has

2   concurred in and authorized the filing of this declaration with this court.

3                                 /s/ Andrea A. Treece

4                                 Andrea A. Treece

5                                 Attorney for Plaintiff

# Exhibit A

Exhibit A

CENTER *for* BIOLOGICAL DIVERSITY                          *Because life is good.*

September 25, 2007

*VIA Certified Mail, Facsimile and EMAIL*

Carlos M. Gutierrez                          Dr. William Hogarth
Secretary of Commerce                        Assistant Administrator for Fisheries
U.S. Department of Commerce                   National Oceanographic and Atmospheric
1401 Constitution Avenue, N.W.,               Administration
Room 5516                                     1315 East-West Highway
Washington, D.C. 20230                        Silver Springs, MD 20910
Email: cgutierrez@doc.gov                     E-mail: bill.hogarth@noaa.gov
Phone (202) 482-2112                          Phone: (301)713-2239
Fax: (202) 482-2741                           Fax:  (301)713-1940

**RE: Blue Whale Ship Strike Mortality off California: Petition for an Emergency
Rulemaking to Reduce the Risk of Unlawful Take of Endangered Species**

Dear Mr. Gutierrez and Mr. Hogarth:

The Center for Biological Diversity formally requests that the Secretary of Commerce
through the National Marine Fisheries Service ("NMFS") promptly initiate an emergency
rulemaking pursuant to your authorities under the Endangered Species Act ("ESA") (16 U.S.C. §
1531 *et seq.*) and Marine Mammal Protection Act ("MMPA")(16 U.S.C. § 1361 *et seq.*) to set
marine vessel speed limits in the Santa Barbara Channel off California to prevent further
mortality resulting from ship strikes to endangered blue whales (*Balaenoptera musculus*).  As
you are likely aware, at least three blue whales have been documented killed as a result of ship
strikes in this area within the past two weeks.  Such a clustering of ship-strike mortalities of blue
whales is unprecedented and constitutes a threat to the recovery of the species.

In recent years, blue whales normally passed through the Santa Barbara Channel en route
to feeding grounds further north, including Monterey Bay.  Most blue whales generally leave the
channel by the end of August.  However, this year, likely due to abnormal ocean conditions,
large numbers of blue whales have remained to feed in the Santa Barbara Channel since June,
placing them in the path of vessels plying some of the busiest shipping lanes in the world.
Whether or not an additional co-factor (e.g. domoic acid poisoning, military sonar exercises, etc.)
is making blue whales more susceptible to ship strikes remains to be seen.  Regardless, as
NMFS' efforts with regard to the North Atlantic right whale clearly demonstrate, the only
effective mechanism to reduce the risk to large whales from ship strikes is to institute mandatory
vessel speed limits in the areas and at times when whales and commercial vessels overlap.  We
therefore request that NMFS immediately promulgate via emergency regulation a 10 nautical
mile per hour speed limit in the Santa Barbara Channel for all vessels over 65 feet in length, such
regulation to remain in effect until all blue whales have been documented to have departed the
area for the year.

**I.     The Endangered Blue Whale and Ship Strikes**

The blue whale is the largest animal known to have ever lived on earth.  Once numbering over 300,000, the global blue whale population has been reduced by commercial whaling to likely fewer than 10,000 individuals.  Blue whales off California are part of the Eastern North Pacific Stock, one of two North Pacific stocks identified by distinct, stereotypic calls.  The current best estimate for the Eastern North Pacific Stock is 1,186 animals.  NMFS 2007.  Draft U.S. Pacific Marine Mammal Stock Assessments: 2007 ("2007 Draft SAR"), available at http://www.nmfs.noaa.gov/pr/pdfs/sars/po2007_draft.pdf.

Under the MMPA the blue whale is considered both "depleted" and "strategic."  The potential biological removal ("PBR") for the Eastern North Pacific Stock is 2 animals per year, and because the stock spends approximately half its time outside of U.S jurisdiction (primarily in waters off Mexico and Central America), the PBR allocation for U.S. waters is 1 animal per year.

The blue whale has been listed as "endangered" under the ESA since the statute's inception.  In 1998, NMFS approved a final recovery plan for the species.  The recovery plan identified ship strikes as one of the primary threats to the species in the Pacific.

> Ship strikes were implicated in the deaths of at least four and possibly six blue whales off California between 1980 and 1993 (Barlow et al. 1995; Barlow et al. 1997). The average number of blue whale mortalities in California attributed to ship strikes was 0.2 per year from 1991-1995 (Barlow et al. 1997). Further mortalities of this nature probably have occurred without being reported. Several of the whales photo-identified off California had large gashes on the dorsal body surface that were thought to have been caused by collisions with vessels (Calambokidis 1995).

Recovery Plan at 12.  The recovery plan also specifically recommends actions to identify areas where ship strikes occur and to take appropriate action to reduce or eliminate such impacts:

> 4.1 Identify areas where ship collisions with blue whales might occur, and areas where concentrations of blue whales coincide with significant levels of maritime traffic or pollution.
>
> 4.2 Identify and implement methods to reduce ship collisions with blue whales.

*Id*. at 21.  The recovery plan concludes that "implementation of appropriate measures designed to reduce or eliminate such problems are essential to recovery" and that such actions "must be taken to prevent a significant decline in population numbers."  *Id*. at 36.

Despite the recommendations of the recovery plan, NMFS has not addressed blue whale ship strikes, and ship strikes have become an increasing problem for the species.  According to the most recent stock assessment report, "ship strikes were implicated in the deaths of blue

whales in 1980, 1986, 1987, 1993, 2002 and 2004." 2007 Draft SAR at 138. In 2003, a blue whale was documented injured (blood in the water) from a ship strike. *Id.* Moreover, there were an additional five serious injuries and three mortalities of unidentified large whales from ship strikes, while additional blue whale mortality from ship strikes likely occurs and goes unreported. *Id.* The average minimum number of blue whale mortalities and serious injuries from 2000-2004 was 0.6 per year. *Id.*

While the number of blue whale ship-strike mortalities has increased in recent years, the three mortalities in 2007 are unprecedented. The first mortality was documented when a blue whale was found dead in Long Beach Harbor on the weekend of September 8th. According to NMFS stranding coordinator Joe Cardaro, as quoted in the LA Times, the Long Beach whale was likely hauled into the harbor on the bow of a ship that hit it in the Santa Barbara Channel. *LA Times*, September 15, 2007, Blue whale washes up on beach near Ventura, available at http://www.latimes.com/news/printedition/california/la-me-whale15sep15,1,4125655.story?coll=la-headlines-pe-california. That whale was subsequently towed out of the harbor without a necropsy. Several days later, on September 11, a second whale was observed dead near San Miguel Island. It washed ashore in Ventura County on September 14. A necropsy of this whale revealed broken bones indicative of a ship strike. Finally, on September 19, a third blue whale was spotted in the Santa Barbara Channel. This whale was towed to shore on September 21, and a subsequent necropsy identified broken bones indicative of a ship strike. In addition to these three confirmed mortalities, a dead blue whale was reported near San Clemente Island on September 12, and another washed ashore near Ensenada, Mexico. These latter two whales may be re-sightings of the Long Beach whale which was towed out to sea, or may represent additional whales killed by ships.

While blue whale sightings in the Santa Barbara Channel are relatively common, most are in the summer as they pass through en route to feeding areas off central and northern California. The whales' presence in the Santa Barbara Channel in September is apparently unprecedented, and likely the result of changing ocean conditions that have affected numerous species of California marine life in recent years. Whatever the reason for the whales' extended stay in the Channel, their continued presence puts them at great risk of ship strikes.

The Ports of Los Angeles and Long Beach are the most active of any U.S. port, with thousands of large vessels arriving each year. As a consequence, the northbound and southbound shipping lanes in the Santa Barbara Channel are among the busiest in the world. The overlap of these shipping lanes with the foraging habitat of the blue whale puts this endangered species at great risk. While we can not likely change the behavior of the blue whales so as to avoid ship strikes, we can and must regulate the behavior of the vessels that pose a risk to the whales. As NMFS' experience with the North Atlantic right whale, a species facing extinction due to ship-strike mortality, demonstrates, the most effective mechanism to reduce the risk of fatal ship strikes is to regulate vessel speed. As discussed below, NMFS has both the authority and duty to promulgate regulations to regulate vessel speed so as to protect the blue whale.

## II.    The ESA and MMPA Require NMFS to Take Action to Prevent Additional Blue Whale Ship Strike Mortality

Both the ESA and the MMPA give NMFS the authority to promulgate all necessary regulations to protect the blue whale from ship strikes.  Section 11(f) of the ESA authorizes NMFS to "promulgate such regulations as may be appropriate to enforce [the ESA]".  16 U.S.C. § 1540(f).  Similarly, the MMPA mandates that NMFS "shall proscribe such regulations as are necessary and appropriate to carry out the purposes of [the MMPA]".  16 U.S.C. § 1382(a).  As described below, these statutes not only authorize NMFS to take action to protect the blue whale, they require it.

Section 2(c) of the ESA establishes that it is "…the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act."  16 U.S.C. § 1531(c)(1).  The ESA defines "conservation" to mean "…the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."   16 U.S.C. § 1532(3).  Similarly, Section 7(a)(1) of the ESA directs that the Secretary of Commerce review "…other programs administered by him and utilize such programs in furtherance of the purposes of the Act."  16 U.S.C. § 1536(a)(1).  Additionally, Section 4(f) specifically requires that NMFS both "…develop and *implement* plans (hereinafter…referred to as 'recovery plans') for the conservation and survival of endangered species and threatened species…"  16 U.S.C. § 1533(f) (emphasis added).  Drafting a recovery plan is not sufficient to comply with this statutory mandate.  Consistent with the intent that recovery plans actually be implemented, Congress required that recovery plans "…incorporate…(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species." 16 U.S.C. § 1533(f)(1)(B)(i).

As discussed above, the recovery plan for the blue whale explicitly requires NMFS "to reduce or eliminate" mortality from ship strikes, and concludes that such action is "essential to recovery" and "must be taken to prevent a significant decline in population numbers."  Recovery Plan at 21, 36.  For NMFS to meet its mandates under Sections 2, 4 and 7 of the ESA, the agency must take prompt action to address ship strikes that are resulting in unsustainable levels of mortality to the blue whale.

Not only does the recent mortality of blue whales from ship strikes threaten the recovery of the species, such take is unlawful.  The ESA prohibits any "person" from "taking" threatened and endangered species in the territorial sea of the United States or upon the high seas. 16 U.S.C. §§ 1538(a)(1)(B)&(C).  The definition of "take", found at 16 U.S.C. § 1532(19), states,

The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

Injuring or killing a blue whale via a ship strike is a violation of this prohibition.  It is also unlawful for any person subject to the jurisdiction of the United States to "cause" the take of a listed species.  The ownership, operation, and authorization of vessels resulting in take of blue

whales has occurred and continues to occur in the absence of any permit from NMFS authorizing such take. NMFS has an obligation to enforce the take prohibition of the ESA as well as to take all necessary action to prevent further violations of the statute.[1]

The MMPA also requires NMFS to take action to prevent further ship strike mortalities of blue whales. The overriding purpose of the MMPA is to maintain species and populations as functional parts of their ecosystems.

> Such species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystems in which they are a part, and consistent with this major objective, they should not be permitted to diminish below there optimum sustainable population. Further measures should be immediately taken to replenish any species or population stock which has already diminished below that population. In particular, efforts should be made to protect essential habitats, including the rookeries, mating grounds, and areas of similar significance for each species of marine mammal from the adverse effect of man's actions.

16 U.S.C. § 1361(2). Moreover, Congress declared that marine mammals "should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem." *Id*. at § 1361(6).

To achieve these ends, Congress dictated that NMFS "*shall* prescribe such regulations as are necessary and appropriate to carry out the purposes of [the MMPA]". 16 U.S.C. § 1382(a). Additionally, for strategic stocks such as the blue whale, Congress explicitly authorized NMFS to "develop and implement conservation or management measures to alleviate . . . impacts" where activities in areas of "ecological significance to marine mammals may be causing a decline or impeding the recovery of the strategic stock." *Id*. at § 1382(e).

In passing the MMPA, Congress explicitly recognized the statute provided a much needed mechanism for regulating vessel traffic that harmed marine mammals. *See* 1972 H.R. Rep. No. 92-707 (1972), reprinted in 1972 U.S.C.C.A.N. 4144, 4147-4156 (noting that "the operation of powerboats in areas where the manatees are found" represented a threat to that species and, absent the new provisions of the MMPA, "at present the Federal government is essentially powerless to force these boats to slow down or curtail their operations." The MMPA "would provide the Secretary of the Interior with adequate authority to regulate or even forbid the use of powerboats in waters where manatees are found.")[2]

---

[1] In addition to NMFS' obligations under the ESA, Section 7(a)(2) requires all other federal agencies whose actions may affect the blue whale to ensure that they do not jeopardize the species. 16 U.S.C. § 1536(a)(2). NMFS should require all agencies who may have jurisdiction over shipping in the Santa Barbara Channel (e.g. the Navy, Army Corps of Engineers, Coast Guard, MARAD, etc.) to consult on their actions in relation to the recent ship strikes.

[2] Under the MMPA, the Secretary of the Interior has jurisdiction over manatees while NMFS has jurisdiction over whales. While the species may differ, the provisions of the MMPA apply in the same manner. Additionally, as noted above, the ESA, which was passed a year after the MMPA, also provides NMFS with authority to regulate shipping impacts on endangered marine mammals.

In addition to protecting populations of marine mammals, the MMPA also protects individual marine mammals. The primary mechanism by which the MMPA protects marine mammals is through the implementation of a "moratorium on the taking" of marine mammals. 16 U.S.C. § 1371(a). Under the MMPA, the term "take" is broadly defined to mean "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill *any* marine mammal." *Id.* § 1362(13) (emphasis added); *see also* 16 U.S.C. § 1362(18)(A) (definition of "harassment" expressly applies to acts that affect "*a* marine mammal or marine mammal stock in the wild")(emphasis added); *Natural Resources Defense Council v. Evans,* 279 F.Supp.2d 1129, 1157 (N.D. Cal. 2002) ("In expressing concern about harassment to 'a marine mammal,' Congress was concerned about harassment to individual animals.").

In addition to the moratorium set forth in Section 1371, Congress enacted Section 1372, which makes it unlawful for persons to take any marine mammal. Section 1372(a)(1) makes it unlawful for "any person . . . vessel or other conveyance subject to the jurisdiction of the United States to take any marine mammal on the high seas." The provisions of Section 1372(a)(2)(A) make it unlawful for "any person or vessel or other conveyance to take any marine mammal in waters or on lands under the jurisdiction of the United States." Section 1372(a)(2)(B) prohibits persons from "using any port, harbor, or other place under the jurisdiction of the United States to take or import marine mammals or marine mammal products." The take of blue whales via ship strikes in the Santa Barbara Channel violates these provisions of the MMPA.

As discussed above, the Eastern North Pacific Stock of blue whales is a strategic stock that is far below its optimum sustainable population. Take of more than one animal a year exceeds the potential biological removal and will therefore, by definition, impede recovery. At least three blue whales are known to have been killed in only a two week stretch this month.[3] These takes are not only individually unlawful, but are well above sustainable limits. As with the ESA, NMFS has the authority and the obligation to take immediate action to address these violations of the MMPA. As demonstrated below, a speed limit on shipping in the Santa Barbara Channel is necessary to achieve this end.

### III.    A Ten Nautical Mile per Hour Vessel Speed Limit in the Santa Barbara Channel is Necessary to Protect Blue Whales

Through this petition, we formally request that NMFS implement on an emergency basis a ten nautical mile per hour speed limit in the Santa Barbara Channel for all vessels over 65 feet in length, such regulation to remain in effect until all blue whales have been documented to have departed the area for the year.[4] In the alternative, in the event NMFS determines an emergency rulemaking is not warranted, we request that NMFS expeditiously proceed with such rulemaking pursuant to notice and comment, such that all necessary protective measures are in place prior to the return of blue whales to the Santa Barbara Channel in 2008.

---

[3] The multiple ship-strike mortalities also likely qualify as an "unusual mortality event" as defined by the MMPA, requiring further response from NMFS. *See* 16 U.S.C. § 1421c; *see also* 71 Fed. Reg. 75234 ("Notice: Availability of new criteria for designation of marine mammal Unusual Mortality Events (UMEs)").

[4] This petition is submitted pursuant to 5 U.S.C. § 553(e) (right to petition), 5 U.S.C. § 553(b)(emergency rulemaking),16 U.S.C. § 1382 (MMPA), and 16 U.S.C. § 1540(f) (ESA).



**Figure 1: The Santa Barbara Channel**

## A. Proposed Regulatory Text

50 CFR part 224 is proposed to be amended as follows:

PART 224--ENDANGERED MARINE AND ANADROMOUS SPECIES

1. The authority citation for 50 CFR Part 224 continues to read as follows:

Authority: 16 U.S.C. 1531-1543 and 16 U.S.C. 1361 et seq.

2. In part 224, a new Sec. 224.106 is added to read as follows:

Sec. 224.106  Speed restrictions to protect blue whales.

(a) The following restrictions apply to: all vessels subject to the jurisdiction of the United States greater than or equal to 65 ft (19.8m) in overall length, and all other vessels greater than or equal to 65 ft (19.8 m)

in overall length entering or departing a port or place under the jurisdiction of the United States.

(1) Santa Barbara Channel: Vessels shall travel at a speed of 10 knots or less during the period of June 1 to December 1 each year in the area bounded by: the shoreline at Point Conception, 34[deg]27'N lat., 120[deg]27'W long.; south to 34[deg]0'N lat., 120[deg]27'W long.; and west to the shoreline at 34[deg]0'N lat., 118[deg]48'30"W long.

(2) [reserved]

(b) It is unlawful under this section:

(1) For any vessel subject to the jurisdiction of the United States to violate any speed restriction established in paragraph (a) of this section; or

(2) For any vessel entering or departing a port or place under the jurisdiction of the United States to violate any speed restriction established in paragraph (a) of this section.

## B. The Proposed Regulation is Necessary to Effectuate the Purposes of the ESA and MMPA

The proposed regulatory language would restrict vessels subject to United States jurisdiction to speeds that have previously been determined by NMFS and independent experts to be necessary to meaningfully reduce the risk of ship-strike mortality to large whales. NMFS is currently engaging in a rulemaking to set marine vessel speed limits in area along the East Coast of the United States so as to protect the North Atlantic Right Whale. *See* 71 Fed. Reg. 36299 (June 26, 2006) ("Endangered Fish and Wildlife; Proposed Rule to Implement Speed Restrictions to Reduce the Threat of Ship Collisions with North Atlantic Right Whales"). The language we have proposed to regulate vessel speeds in the Santa Barbara Channel parallels that NMFS has developed for the right whale.

In the right whale rulemaking, NMFS acknowledged the limitations of voluntary measures and advisories.

Despite conservation efforts developed and undertaken by agencies, stakeholders, partners and industry throughout the 1990s, right whale deaths from ship strikes continue. NMFS believes that existing measures have not been sufficient to reduce the threat of ship strikes or improve chances for recovery (for example, a study of mariner compliance with NOAA-issued speed advisories in the Great South Channel reported that 95 percent of ships tracked (38 out of 40) did not slow down or route around areas in which right whale sightings occurred (Moller et al., 2005)). Accordingly, NMFS determined that further action was required.

8

71 Fed. Reg. at 36301.  NMFS concluded that speed limits were likely the most effective measure to actually reduce ship strike mortalities.  We believe such mandatory measures are appropriate here.

> NOAA's proposed use of speed restrictions to reduce ship strikes is based on several types of evidence. *An examination of all known ship strikes indicates vessel speed is a principal factor*. Records of right whale ship strikes (Knowlton and Kraus, 2001) and large whale ship strike records (Laist et al., 2001; Jensen and Silber, 2003) have been compiled. In assessing records in which vessel speed was known, Laist et al. (2001) found "a direct relationship between the occurrence of a whale strike and the speed of the vessel involved in the collision."

71 Fed. Reg. at 36303 (emphasis added).

We request that NMFS impose a ten nautical mile per hour (i.e. ten knot) speed limit in the Santa Barbara Channel as that is the speed NMFS has determined is most effective at protecting large whales.  In the right whale rulemaking NMFS summarized the finding of scientists on the relationship of vessel speed to whale injuries and mortalities.

> Using a total of 64 records of ship strikes in which vessel speed was known, Pace and Silber (2005) tested speed as a predictor of the probability of a whale death or serious injury. *The authors concluded that there was strong evidence that the probability of death or serious injury increased rapidly with increasing vessel speed.* Specifically, the predicted probability of serious injury or death increased from 45 percent to 75 percent as vessel speed increased from 10 to 14 knots, and exceeded 90 percent at 17 knots. In a related study, Vanderlaan and Taggert (in review) analyzed all published historical data on vessels striking large whales. Looking at cases where a strike occurred, the authors found that the probability that a strike would result in lethal rather than non-lethal injury ranged from 20 percent at 9 knots, to 80 percent at 15 knots, to 100 percent at 21 knots or greater.

71 Fed. Reg. at 36303 (emphasis added).

NMFS' proposed ten-knot speed limit in the right whale regulation is also supported by the Marine Mammal Commission.  In its comment letter on the proposed rule, the Commission explained why setting the speed limit higher than ten-knots would likely be ineffective.

> In its Federal Register notice, the Service proposed a 10-knot speed limit but also solicited comments on implementing alternative speed limits of 12 or 14 knots. As discussed in the notice, the best available data on ship/whale collisions indicate that the probability of serious or lethal injuries to whales is very low when vessels travel at speeds of less than 10 knots.  Risks increase rapidly at speeds between 10 and 13 knots. The data also indicate that the largest number of serious or lethal injuries occurs at speeds of 14 to 15 knots. Thus, a 14 knot limit appears to offer little, and possibly no, reduction in the risk of collision.

In establishing a speed limit, the Service also should consider human nature. When confronted with speed restrictions, many people travel at speeds slightly above the established limit. If a 12-knot limit is selected and vessel operators actually travel only a knot or two faster, they will be moving at speeds known to be dangerous to right whales. As a result, much of the potential conservation benefit of the speed restriction regulation would be lost. Accordingly, the Marine Mammal Commission recommends that the Service adopt a 10-knot speed limit as proposed.

Marine Mammal Commission, August 15, 2006 letter at 2.

In sum, the only effective mechanism to reduce the risk of ship strikes on large whales is a speed limit in the time and place where whales and ships overlap. A ten nautical mile per hour speed limit in the Santa Barbara Channel is necessary and appropriate to reduce the risk of vessel collisions with blue whales.

In the right whale rulemaking, NMFS proposed to apply the speed limit to vessels 65 feet and longer.

Available data indicate that most lethal collisions are caused by large vessels (Laist et al., 2001; Jensen and Silber, 2003). In this proposed rulemaking, NMFS proposes 65ft (19.8m) as the vessel size threshold for speed restrictions. NMFS is aware that right whale collisions can occur with vessels smaller than 65 ft (19.8 m) and result in serious injury or death. Sixty-five feet (19.8m) is a size threshold recognized in the maritime community and commonly used in maritime regulations to distinguish between motorboats and larger vessels, of which the latter are subject to additional regulatory requirements (e.g., Automatic Identification System (AIS) requirements; International Navigational Rules Act, Rules of the Road sections).

71 Fed. Reg. at 36305. This same rationale as applied to the right whale applies here, and we believe NMFS should set speed limits in the Santa Barbara Channel for all vessels 65 feet and greater.[5]

This petition seeks to have the requested ten nautical mile per hour speed limit apply in the waters of the Santa Barbara Channel from June 1 until December 1. In "normal" years blue whales are generally seen in the Santa Barbara Channel from June through August, with occasional animals seem as late as November. This year the whales have remained in the area throughout September and there is no indication as to when they will depart. We believe that a speed limit should cover the entire season that whales are present in the channel. Keeping the regulation in effect until December will likely protect any whales that remain in the channel into the fall.

---

[5] Given the critically imperiled status of the right whale, speed restriction on vessels smaller that 65 feet may be appropriate in some areas to address the greater impact of ship strikes on the right whale. The 65 foot threshold is likely sufficient for the blue whale in the Santa Barbara Channel.

## IV.    Conclusion

The blue whale is one of the most endangered marine mammals in the world.  At least three of these endangered and legally protected species have died in Southern California waters this month.  All three deaths were likely the result of ship strikes occurring in the Santa Barbara Channel, with two of the mortalities confirmed as ship strikes following necropsies.  While any mortality of endangered whales should be avoided, this recent level of mortality threatens the recovery of the species and is cause for alarm.  Whether this high mortality is simply a result of an unusually high number of whales feeding in one of the busiest shipping lanes in the world, or is tied to domoic acid poisoning or some other environmental factor rendering individual whales more vulnerable to ships remains to be seen.  However, regardless of *why* more whales are dying this year, it entirely clear that the direct *cause* of their deaths is from ship strikes.

As NMFS efforts to reduce ship strike mortalities to right whales in the Atlantic demonstrate, the only mechanism that is likely to actually be effective in reducing large whale mortalities from ships is to impose mandatory large vessel speed limits in the times and areas where there is overlap between vulnerable whales and high large vessel traffic.  Therefore, the appropriate response of NMFS to the current blue whale mortality event is to impose a seasonal speed limit of 10 nautical miles per hour on all vessels 65 feet or larger in the Santa Barbara Channel.  Such action via regulation should be promptly initiated so as to be effective this year and remain in place in succeeding years until and unless it can be demonstrated that ship strikes no longer pose a threat to blue whales in the area.  We look forward to your prompt response to this petition.

Sincerely,

Brendan Cummings
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252

# Exhibit B

DATE: October 10, 2007 14:51:26 PST



Coast Guard Blue Whale Operations Update

*District 11 Public Affairs*
**U.S. Coast Guard**



**United States Coast Guard**
U.S. Department of Homeland Security

# Press Release

Date: 9 October 2007
Contact:
Coast Guard Public Affairs
310-521-4260

## Coast Guard Blue Whale Operations Update

ALAMEDA, Calif -- Coast Guard District Eleven continues to support the National Marine Fisheries Service (NMFS) in conducting overflights to monitor the locations of blue whales in the Santa Barbara Channel and surrounding area. This information is being passed to vessel agents to increase industry awareness.

Since September 8, 2007, two blue whale carcasses have been discovered in the Santa Barbara Channel, and one was discovered in Long Beach Harbor. The Coast Guard is working closely with NOAA concerning measures to help protect against future blue whale strikes. Commercial mariners are cooperating in this effort. The following is a list of the measures that Coast Guard, in conjunction with NOAA, has taken:

- The Coast Guard issued a Broadcast Notice to Mariners advising mariners transiting through the channel and in and out of Los Angeles and Long Beach Harbors to exercise caution. The Broadcast Notice to Mariners includes NOAA's recommendation that all vessel operators transiting the Santa Barbara Channel do so at speeds not in excess of 10 knots.
- Coast Guard Vessel Traffic Service (VTS) continues to issue warnings to commercial vessels planning to transit through the Santa Barbara Channel of the potential for blue whales.
- The Coast Guard issued a press release to vessel agents and the port authorities for Los Angeles and Long Beach notifying them of the potential presence of blue whales in the Santa Barbara Channel and Los Angeles and Long Beach Harbors.
- Coast Guard District Eleven continues to support the National Marine Fisheries Service (NMFS) in conducting overflights to monitor the locations of blue whales.
- NOAA is using its National Weather Service marine radio program to broadcast the Coast Guard's Broadcast Notice to Mariners with NOAA's recommendation that all vessel operators transiting the Santa Barbara Channel do so at speeds not in excess of 10 knots.
- The Coast Guard is continuing to work with NOAA to monitor this situation and assist NOAA in the adoption of other measures as necessary.

Collisions with whales or sightings of injured whales should be reported to the National Oceanic and Atmospheric Administration (NOAA) at (562) 980-4017. Boaters can contact the U.S. Coast Guard on Channel 16.

 For more information on U.S. Coast Guard living marine resource protection please see...
http://www.uscg.mil/hq/g-o/g-opl/LMR/LMR.htm

For more information on Blue Whales from NOAA, please see...
http://www.nmfs.noaa.gov/pr/species/mammals/cetaceans/bluewhale.htm

# Exhibit C

**Exhibit C**

 CENTER *for* B I O L O G I C A L   D I V E R S I T Y                      *Because life is good.*

**Via Electronic and Certified Mail**

November 8, 2007

Mr. Michael Chertoff
Secretary of Homeland Security
Department of Homeland Security
245 Murray Lane, SW
Washington, DC 20528
Email: michael.chertoff@dhs.gov


Admiral Thad W. Allen
Commandant of the U.S. Coast Guard
U.S. Coast Guard
2100 Second Street, SW
Washington, DC 20593
Email: thad.w.allen@uscg.mil


Rear Admiral Craig E. Bone
Commander, District Eleven
U.S. Coast Guard
Building 42, Coast Guard Island
Alameda, CA 94501
Email: craig.e.bone@uscg.mil

Mr. Carlos M. Gutierrez
Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Ave., N.W., Rm. 5516
Washington, D.C. 20230
Email: cgutierrez@doc.gov


Dr. William Hogarth
Assistant Administrator for Fisheries
National Oceanographic and
Atmospheric Administration
1315 East-West Highway
Silver Springs, MD 20910
E-mail: bill.hogarth@noaa.gov


**RE: 60-Day Notice of Intent to Sue: Violations of the Endangered Species Act
Related to the Management of Ship Traffic in the Santa Barbara Ship Channel**

Dear Mr. Chertoff, Admiral Allen, Rear Admiral Bone, Mr. Gutierrez, and Dr. Hogarth:

  This letter serves as a sixty day notice on behalf of the Center for Biological
Diversity ("CBD") of intent to sue the U.S. Coast Guard over violations of Sections 2, 7,
and 9 of the Endangered Species Act ("ESA")(16 U.S.C. § 1531 *et seq.*) for actions and
inactions related to the management and regulation of ship traffic in the Santa Barbara
Ship Channel and elsewhere along the California coast.  Through this letter we also put
Coast Guard on notice that we believe the agency's failure to consult with the National
Marine Fisheries Service ("NMFS") regarding the effects of the ship traffic separation
scheme ("TSS") it implements puts the agency in violation of the procedural and
substantive mandates of both the ESA. This letter is provided pursuant to the 60-day

Mr. Michael Chertoff et al.
60-Day Notice of ESA Violations Related to Ship Traffic Management
November 8, 2007
Page 2 of 10

notice requirement of the citizen suit provision of the ESA, to the extent such notice is deemed necessary by a court. *See* 16 U.S.C. § 1540(g).[1]

**The U.S. Coast Guard's Authority Under the Ports and Waterways Safety Act**

The U.S. Coast Guard proposes and implements ship traffic separation schemes pursuant to its authority under the Ports and Waterways Safety Act of 1972, 33 U.S.C. §1221 *et seq.* ("PWSA"). The PWSA authorizes the Coast Guard to establish vessel traffic routing schemes with respect to any vessel and in any waters subject to U.S. jurisdiction. 33 U.S.C. § 1223(a)(4). The Coast Guard may promulgate a TSS not only within the U.S. territorial sea, but in areas of the high seas used to approach U.S. ports. *Id.* at §1223(c)(5)(B) & (D). The TSS applies to U.S. vessels as well as foreign vessels destined for or departing from U.S. ports. *Id.* at §1223(c)(5)(B) & (D) and §1223(d).

Prior to designating a TSS, the Coast Guard must complete a Port Access Route Study to determine potential ship traffic density and the need for safe access routes for vessels in the area where the TSS is proposed. In addition, the Coast Guard must consult with the Secretary of Commerce and Secretary of the Interior, among others, regarding all other uses of the area under consideration, including the potential establishment of marine sanctuaries. *Id.* at §1223(c)(3)(A)-(B). In carrying out these and other responsibilities under the PWSA, the Coast Guard must take into account protection of the marine environment. *Id.* at §1224(a).

Once the Coast Guard has designated a TSS, it must notify the appropriate international organizations (generally speaking, the International Maritime Organization ("IMO")) of the designation and seek the cooperation of foreign nations in making the TSS mandatory for vessels under foreign control on the high seas. *Id.* at §1223(c)(5)(D); *see also id.* at §1230(a). Notably, the IMO's approval is not necessary to implement the TSS with respect to U.S. vessels or vessels within U.S. waters. In fact, the PWSA explicitly *prohibits* nongovernmental entities from carrying out inherently governmental functions – i.e., those that require the exercise of discretion in applying U.S. government authority or the use of judgment in making a decision for the U.S. government. *Id.* at §1223(e)(2)-(3). *See also* International Convention for the Safety of Life at Sea, 32 U.S.T. 47, T.I.A.S. No. 9700 ("The selection of the routes and the initiation of action with regard to them, and the delineation of what constitutes converging areas, will be primarily the responsibility of the Government concerned").

Vessels are not required to use the TSS unless the Coast Guard chooses to make use of a particular TSS mandatory. 33 U.S.C. §1223(c)(5)(B). If a vessel does use an

---

[1] As you are likely aware, claims brought under the ESA are brought pursuant to the Administrative Procedure Act ("APA") and therefore do not require 60 days notice before suit. To the extent any of the violations of law described in this letter require affirmative action by the U.S. Coast Guard, please consider this letter a formal petition for such action pursuant to 5 U.S.C. § 553(e).

Mr. Michael Chertoff et al.
60-Day Notice of ESA Violations Related to Ship Traffic Management
November 8, 2007
Page 3 of 10

IMO-adopted TSS, the vessel must also comply with Rule 10 of the International Regulations for Preventing Collisions at Sea, 1972 (72 COLREGS). Rule 10 requires vessels using an IMO-approved TSS to travel in the appropriate lane and follow the general traffic flow for that lane, and prohibits vessels from crossing a separation line or entering a separation zone. 64 Fed. Reg. at 32452. Should a vessel choose not to use the TSS and the vessel is involved in a collision, a presumption of liability arises on the part of the vessel operating outside the TSS. *See Washington v. Sea Coast Towing Inc.*, No. 03-166Z, 2004 WL 3780362, *5 (W.D. Wash. Apr. 30, 2004) ("Under the Pennsylvania Rule, when a vessel is in violation of a [routing regulation] at the time of a collision [that] was intended to prevent such an occurrence, a rebuttable presumption arises that the statutory violation caused the accident."), *rev'd on other gds*, 148 Fed. Appx. 612 (9th Cir. 2005)(citing *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136 (1873)); *see also Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 822, 826 (9th Cir. 1988) ("There is no question that [complying with COLREGS] is now a statutory duty") and *In re Texaco*, 570 F. Supp. 1284 (E.D. La. 1983) ("Good seamanship, however, requires that ships should, in general comply with the [traffic separation] scheme, so that failure by any ship to comply with it may well amount to negligent navigation on her part").

The Coast Guard first adopted a TSS for the Santa Barbara ship channel in 1969. 64 Fed. Reg. 32451, 32452 (June 17, 1999). In 1985, the IMO adopted an 18-mile westward extension of the northwest end of the Santa Barbara ship channel TSS, which was designed to increase ship safety while transiting oil exploration and development zones and to reduce the risk of ship collisions and groundings closer to shore. *Id.* However, the Coast Guard "elected to postpone implementation of the IMO-adopted TSS amendments" until studies on the Monterey Bay National Marine Sanctuary and oil tanker routing along the California coast were completed. *Id.* at 32453. In 2000, the Coast Guard promulgated regulations to implement IMO-adopted changes to the Santa Barbara Channel TSS and the TSS off San Francisco, as well as to codify in regulation the existing TSS in the approaches to Los Angeles-Long Beach. 65 Fed. Reg. 46603 (July 31, 2000).

Since 2000, the Coast Guard has continued to implement the Santa Barbara Channel TSS by continually reviewing the TSS, advising vessel traffic of its location and constraints, monitoring and coordinating vessel traffic, and carrying out enforcement activities with respect to vessel traffic. *See, e.g.*, 33 U.S.C. §1223(c)(5)(C) (authorizing Coast Guard to "adjust the location or limits of designated fairways or traffic separation schemes, in order to accommodate the needs of other uses that cannot be reasonably accommodated otherwise"); U.S. Coast Guard Dist. 11 Special Notice to Mariners, Ch. 4: Vessel Traffic Safety, *available at* http://www.uscg.mil/d11/dp/dpw/special_index.html and http://www.uscg.mil/d11/dp/dpw/specialNTM/spec4_06.pdf (explaining that U.S. Coast Guard monitors, coordinates, and carries out enforcement activities with respect to vessel traffic and confirming that "[t]he Coast Guard continually reviews existing and proposed TSSs in its waters").

Mr. Michael Chertoff et al.
60-Day Notice of ESA Violations Related to Ship Traffic Management
November 8, 2007
Page 4 of 10

**Recent Ship Strike Mortalities of ESA-Listed Whales**

<u>Blue Whales</u>

In recent years, blue whales normally passed through the Santa Barbara Channel en route to feeding grounds further north, including Monterey Bay. Most blue whales generally leave the channel by the end of August. However, this year, likely due to abnormal ocean conditions, large numbers of blue whales have remained to feed in the Santa Barbara Channel since June, placing them in the path of vessels plying some of the busiest shipping lanes in the world. As a result, at least three blue whales have been killed this year alone as a result of ship strikes.

The blue whale is the largest animal known to have ever lived on earth. Once numbering over 300,000, the global blue whale population has been reduced by commercial whaling to likely fewer than 10,000 individuals. Blue whales off California are part of the Eastern North Pacific Stock, one of two North Pacific stocks identified by distinct, stereotypic calls. The current best estimate for the Eastern North Pacific Stock is 1,186 animals. NMFS 2007. Draft U.S. Pacific Marine Mammal Stock Assessments: 2007 ("2007 Draft SAR"), available at http://www.nmfs.noaa.gov/pr/pdfs/sars/po2007_draft.pdf.

Under the Marine Mammal Protection Act ("MMPA") the blue whale is considered both "depleted" and "strategic." The potential biological removal ("PBR") for the Eastern North Pacific Stock is 2 animals per year, and because the stock spends approximately half its time outside of U.S jurisdiction (primarily in waters off Mexico and Central America), the PBR allocation for U.S. waters is 1 animal per year.

The blue whale has been listed as "endangered" under the ESA since the statute's inception. In 1998, NMFS approved a final recovery plan for the species. The recovery plan identified ship strikes as one of the primary threats to the species in the Pacific.

Ship strikes were implicated in the deaths of at least four and possibly six blue whales off California between 1980 and 1993 (Barlow et al. 1995; Barlow et al. 1997). The average number of blue whale mortalities in California attributed to ship strikes was 0.2 per year from 1991-1995 (Barlow et al. 1997). Further mortalities of this nature probably have occurred without being reported. Several of the whales photo-identified off California had large gashes on the dorsal body surface that were thought to have been caused by collisions with vessels (Calambokidis 1995).

Mr. Michael Chertoff et al.
60-Day Notice of ESA Violations Related to Ship Traffic Management
November 8, 2007
Page 5 of 10

Recovery Plan at 12. The recovery plan also specifically recommends actions to identify areas where ship strikes occur and to take appropriate action to reduce or eliminate such impacts:

> 4.1 Identify areas where ship collisions with blue whales might occur, and areas where concentrations of blue whales coincide with significant levels of maritime traffic or pollution.

> 4.2 Identify and implement methods to reduce ship collisions with blue whales.

*Id.* at 21. The recovery plan concludes that "implementation of appropriate measures designed to reduce or eliminate such problems are essential to recovery" and that such actions "must be taken to prevent a significant decline in population numbers." *Id.* at 36.

Despite the recommendations of the recovery plan, neither NMFS nor the Coast Guard has addressed blue whale ship strikes, and ship strikes have become an increasing problem for the species. According to the most recent stock assessment report, "ship strikes were implicated in the deaths of blue whales in 1980, 1986, 1987, 1993, 2002 and 2004." 2007 Draft SAR at 138. In 2003, a blue whale was documented injured (blood in the water) from a ship strike. *Id.* Moreover, there were an additional five serious injuries and three mortalities of unidentified large whales from ship strikes, while additional blue whale mortality from ship strikes likely occurs and goes unreported. *Id.* The average minimum number of blue whale mortalities and serious injuries from 2000-2004 was 0.6 per year. *Id.*

While the number of blue whale ship-strike mortalities has increased in recent years, the three mortalities in 2007 are unprecedented. The first mortality was documented when a blue whale was found dead in Long Beach Harbor on the weekend of September 8th. According to NMFS stranding coordinator Joe Cordaro, as quoted in the LA Times, the Long Beach whale was likely hauled into the harbor on the bow of a ship that hit it in the Santa Barbara Channel. *LA Times*, September 15, 2007, Blue whale washes up on beach near Ventura, available at http://www.latimes.com/news/printedition/california/la-me-whale15sep15,1,4125655.story?coll=la-headlines-pe-california. That whale was subsequently towed out of the harbor without a necropsy. Several days later, on September 11, a second whale was observed dead near San Miguel Island. It washed ashore in Ventura County on September 14. A necropsy of this whale revealed broken bones indicative of a ship strike. Finally, on September 19, a third blue whale was spotted in the Santa Barbara Channel. This whale was towed to shore on September 21, and a subsequent necropsy identified broken bones indicative of a ship strike. In addition to these three confirmed mortalities, a dead blue whale was reported near San Clemente Island on September 12, and another washed ashore near Ensenada, Mexico. These latter two

Mr. Michael Chertoff et al.
60-Day Notice of ESA Violations Related to Ship Traffic Management
November 8, 2007
Page 6 of 10

whales may be re-sightings of the Long Beach whale which was towed out to sea, or may represent additional whales killed by ships.

While blue whale sightings in the Santa Barbara Channel are relatively common, most are in the summer as they pass through en route to feeding areas off central and northern California. The whales' presence in the Santa Barbara Channel in September is apparently unprecedented, and likely the result of changing ocean conditions that have affected numerous species of California marine life in recent years. Whatever the reason for the whales' extended stay in the Channel, their continued presence puts them at great risk of ship strikes.

The Ports of Los Angeles and Long Beach are the most active of any U.S. port, with thousands of large vessels arriving each year. As a consequence, the northbound and southbound shipping lanes in the Santa Barbara Channel are among the busiest in the world. The overlap of these shipping lanes with the foraging habitat of the blue whale puts this endangered species at great risk. As NMFS' experience with the North Atlantic right whale, a species facing extinction due to ship-strike mortality, demonstrates, the most effective mechanism to reduce the risk of fatal ship strikes is to regulate vessel traffic, including vessel speed.

<u>Humpback Whales</u>

Humpbacks regularly travel through and near the Santa Barbara Channel and, like blue whales, are not infrequently struck by ships using the channel. The humpback's tendency to inhabit coastal waters makes it the second most common species to be killed by ship strikes. Jensen, A.S. and G.K. Silber. 2003. Large Whale Ship Strike Database. U.S. Department of Commerce, NOAA Technical Memorandum, NMFS-OPR, at 2 ("NMFS Ship Strike Database"). Humpbacks use this area for feeding as well as migrating to and from their calving grounds along the west coast of Mexico and Central America. Ship traffic within the Santa Barbara Channel TSS therefore poses a particular danger to reproductive females.

Humpback whales have been listed as "endangered" under the ESA since 1970 and are listed as "depleted" and "strategic" under the MMPA. The whales affected by the Santa Barbara Channel TSS are part of the Eastern North Pacific stock, which has an estimated population of just over 1,300. NMFS, Stock Assessment for Humpback Whale, Eastern North Pacific Stock (Nov. 1, 2005) ("2005 Stock Assessment") at 167. The PBR allocation for humpbacks in U.S. waters is 2.3 whales per year. 2005 Stock Assessment at 168.

The 2005 Stock Assessment reported that ship strikes regularly injure and kill humpback whales:

Mr. Michael Chertoff et al.
60-Day Notice of ESA Violations Related to Ship Traffic Management
November 8, 2007
Page 7 of 10

Ship strikes were implicated in the deaths of at least two humpback whales in 1993, one in 1995, and one in 2000 (J. Cordaro, NMFS unpubl. data). During 1999-2003, there were an additional 5 injuries and 2 mortalities of unidentified large whales attributed to ship strikes. Additional mortality from ship strikes probably goes unreported because the whales do not strand or, if they do, they do not have obvious signs of trauma. Several humpback whales have been photographed in California with large gashes in their dorsal surface that appear to be from ship strikes (J. Calambokidis, pers. comm.). The average number of humpback whale deaths by ship strikes for 1999-2003 is at least 0.2 per year.

2005 Stock Assessment at 169. *See also* 50 C.F.R. §224.103(a)-(b) (recognizing threat of ship collisions and requiring that vessels off Hawaii and Alaska travel at slow, safe speed when humpbacks are present and maintain a minimum distance between humpback whales and the vessel).

As NMFS acknowledged in the 2005 Stock Assessment, more humpback whales are likely killed or injured by ship strikes than are reported. *See also* NMFS Ship Strike Database at 5-6 (discussing likely underreporting of ship strikes). NMFS's Large Whale Ship Strike database reports numerous unidentified whales that have been killed in the waters off southern California. NMFS Ship Strike Database at 24, 26. Add to this the number of whale mortalities that go unobserved, unreported, and uncounted, and it becomes quite apparent that ship strike mortality is significant problem preventing the recovery of the species.

**Violations of the ESA**

Section 2(c) of the ESA establishes that it is "…the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." 16 U.S.C. § 1531(c)(1). The ESA defines "conservation" to mean "…the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3). Similarly, Section 7(a)(1) of the ESA directs that the Secretary review "…other programs administered by him and utilize such programs in furtherance of the purposes of the Act." 16 U.S.C. § 1536(a)(1).

The Coast Guard's continued implementation of the TSS is violating Sections 2(c) and 7(a)(1) of the ESA because the agency refuses to use its authorities to further the purpose of listed species conservation. Specifically, by not initiating consultation, or taking or taking other measures to avoid unlawful take following the unpermitted taking of a blue whales and humpback whales by ship traffic (such as instituting a mandatory speed limit in the Santa Barbara ship channel), the Coast Guard is violating these

Mr. Michael Chertoff et al.
60-Day Notice of ESA Violations Related to Ship Traffic Management
November 8, 2007
Page 8 of 10

provisions. *See Sierra Club v. Babbitt*, 65 F.3d 1502, 1511, fn 15 ("If Seneca violates section 9, or any other environmental standard, the BLM need not consult with the FWS before exercising its right under the environmental stipulation to terminate the offending project. Indeed, section 7(a)(1) would appear to *require* the BLM to utilize its authority under the stipulation to suspend an activity that would result in a taking.") (emphasis in original).

Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species . . .determined . . . to be critical . . . ." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).  To accomplish this goal, agencies must consult with the delegated agency of the Secretary of Commerce or Interior whenever their actions "may affect" a listed species.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

At the completion of consultation NMFS issues a Biological Opinion that determines if the agency action is likely to jeopardize the species.  If so, the opinion must specify a Reasonable and Prudent Alternative ("RPA") that will avoid jeopardy and allow the agency to proceed with the action. 16 U.S.C. § 1536(b).

The Coast Guard's implementation of the Santa Barbara Channel TSS pursuant to the PWSA is clearly agency action as defined by the ESA and its implementing regulations.  Implementation of the TSS and vessel operations authorized pursuant to the TSS "may affect" listed species by directing ship traffic to operate within key blue whale and humpback whale habitat, putting the animals in the path of gigantic, fast-moving ships and exposing them to serious injury and death.

The Coast Guard is in violation of Section 7(a)(2) of the ESA and its implementing regulations by failing to initiate and complete consultation on the effects of the TSS implemented by the Coast Guard and resulting routing and operation of ship traffic bound for and departing from U.S. ports on blue whales, humpback whales, fin whales, sperm whales and other threatened and endangered species.

Section 7(d) of the ESA, 16 U.S.C. § 1536(d), provides that once a federal agency initiates consultation on an action under the ESA, the agency, as well as any applicant for a federal permit, "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section."  The purpose of Section 7(d) is to maintain the environmental status quo pending the completion of interagency consultation.  Section 7(d) prohibitions remain in effect throughout the consultation period and until the federal agency has satisfied its obligations under Section 7(a)(2) that

Mr. Michael Chertoff et al.
60-Day Notice of ESA Violations Related to Ship Traffic Management
November 8, 2007
Page 9 of 10

the action will not result in jeopardy to the species or adverse modification of its critical habitat.

If and when the Coast Guard initiates or reinitiates consultation, the Coast Guard will be in violation of Section 7(d) if it engages in any activity that would foreclose reasonable and prudent alternatives. Such activity would include, but not be limited to, the authorization or otherwise permitting of any shipping activity that might result in take of a listed species pending the completion of consultation. Continued implementation of the TSS or permitting ship traffic to continue to use this area without instituting adequate protective measures, such as a mandatory 10-knot speed limit while whales are present in the area, would be such a violation.

An agency's duty to avoid jeopardy is continuing, and "where discretionary Federal involvement or control over the action has been retained or is authorized by law," the agency must in certain circumstances reinitiate formal consultation. 50 C.F.R. § 402.16. The Coast Guard's implementation of the Santa Barbara Channel TSS is clearly a continuing agency action requiring reinitiation of consultation if any of the triggering circumstances occur. The excessive number of blue whales killed by ship strikes in the past year constitutes "new information" triggering the reinitiation requirement.

The ESA prohibits any "person" from "taking" threatened and endangered species. 16 U.S.C. § 1538. The definition of "take", found at 16 U.S.C. § 1532(19), states,

> The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

In this case, the Coast Guard has never undertaken ESA Section 7 consultation on the effects of the TSS on listed species, and therefore has no authority to take or to permit the take of those species. Nevertheless, take of blue whales and humpback whales has occurred. Because the Coast Guard has failed to reinitiate consultation, it is in violation of its procedural and substantive mandates to insure against jeopardy to listed species.

**Conclusion**

As the above makes clear, the Coast Guards continued implementation of the Santa Barbara Channel TSS without undertaking ESA Section 7 consultation with NMFS violates the ESA. If the Coast Guard does not act within 60 days to correct the violations described in this letter, our organizations will pursue litigation in Federal Court against the Coast Guard. We will seek injunctive and declaratory relief, and legal fees and costs regarding these violations. An appropriate remedy that would prevent litigation would be for the Coast Guard to initiate formal consultation with NMFS under ESA Section 7

Mr. Michael Chertoff et al.
*60-Day Notice of ESA Violations Related to Ship Traffic Management*
November 8, 2007
Page 10 of 10


regarding the effects of ship traffic under the TSS on listed marine mammals, in particular, blue whales and humpback whales.

      If you have any questions, wish to meet to discuss this matter, or feel this notice is in error, please contact me at (415) 436-9682 x306.  Thank you for your concern.


Sincerely,


Andrea A. Treece
Center for Biological Diversity



# Exhibit D

**Exhibit D**

**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Silver Spring, Maryland 20910

ᴶAN   8 2008

MEMORANDUM FOR:   John Oliver
                                  Acting Assistant Administrator
                                     for Fisheries

FROM:                       James H. Lecky
                                  Director, Office of Protected Resources

SUBJECT:                   DECISION MEMORANDUM – Response to Petition from
                                  The Center for Biological Diversity to Implement Emergency
                                  Regulations in Southern California to Protect Blue Whales


PETITION FOR ACTION

On September 25, 2007, the Center for Biological Diversity (CBD) petitioned the Secretary of
Commerce through NOAA's National Marine Fisheries Service (NMFS) requesting "NMFS
implement on an emergency basis a ten nautical mile per hour speed limit in the Santa Barbara
Channel for all vessels over 65 feet in length, such regulation to remain in effect until all blue
whales have been documented to have departed the area for the year.  In the alternative, in the
event NMFS determines an emergency rulemaking is not warranted, we request NMFS
expeditiously proceed with such rulemaking pursuant to notice and comment, such that all
necessary protective measures are in place prior to the return of blue whales to the Santa Barbara
Channel in 2008."

CBD's petition points to the documented ship strike deaths of three blue whales in September
2007, and maintains that a clustering of three blue whale deaths is unprecedented and constitutes
a threat to the recovery of the species.

BACKGROUND

Global blue whale populations became severely depleted primarily as a result of commercial
whaling.  Blue whales are listed as "endangered" under the Endangered Species Act (ESA) and
are considered "depleted" and "strategic" under the Marine Mammal Protection Act (MMPA).
In 1998, NMFS approved a final recovery plan for the blue whale pursuant to the ESA.

Blue whales inhabit and feed in both coastal and pelagic environments and are frequently found
on the continental shelf in areas off the California coast.  The blue whales of concern to CBD are
part of the eastern North Pacific stock, believed to be one of two North Pacific stocks.  The best
estimate of blue whale abundance in California is 1,186 animals (CV= 0.19).  Combining this
estimate with that from the eastern tropical Pacific, the total eastern North Pacific population
south of Oregon is estimated at approximately 3,500 whales.  There is some indication that blue
whale abundance increased in California coastal waters in the 1980s.  It is unclear, however, if

the increases are due to an increase in the stock as a whole, or the result of an increased use of waters off coastal California as a feeding area.

Blue whales are common in waters off California and are typically present between June and November. They feed on "krill", mainly *Euphausids*, and the U.S. west coast is an important feeding area. In fall 2007, blue whales responded to prey aggregations near the Channel Islands, particularly in and near SBC. Occurrences of the prey aggregations, and blue whales associated with them, can be ephemeral and may vary annually in location and distribution.

Ship strikes of blue whales occur occasionally. The average number of blue whale mortalities and injuries in this population attributed to ship strikes was 0.6 per year from 2000 to 2004. Between 1998 and 2004, five blue whale severe injuries or deaths, and three deaths of unidentified large whales, were attributed to ship strikes. Several blue whales have been photographed in California over the years with gashes that appear to be from ship strikes. Additional mortality from ship strikes probably goes unreported because not all dead whales strand or, if they do, it is not always possible to determine the cause of death. The potential biological removal (PBR) level for this stock, calculated pursuant to the MMPA, is 1.0 blue whale per year.

In early September 2007, an unusually high number of blue whales, likely feeding aggregations, occurred in the Santa Barbara Channel (SBC), California, and nearby waters. Between September 8 and September 19, 2007, NOAA received reports of five blue whale carcasses in California's Channel Island area extending from Santa Cruz Island to immediately north of San Diego. The five reported carcasses may constitute three or four individuals as some may be re-sights of the same drifting carcasses. Two additional blue whale carcasses, an adult female and very young animal (believed to be an expelled post-stranding fetus), were observed washed ashore on San Miguel Island on November 29. They were estimated to have been dead for several weeks.

Of the strandings, scientists were able to perform complete necropsies on two whales and evaluated the two additional carcasses. The necropsied whales exhibited blunt force trauma or other wounds consistent with injuries sustained in a collision with a large vessel. The two additional carcasses found on November 29 were evaluated, and it was determined that the adult had injuries consistent with those sustained in a collision with a large vessel. The calf likely died as a consequence of its mother being struck and killed.

After consulting with the Working Group on Unusual Marine Mammal Mortality Events, NMFS designated the recent blue whale mortalities in southern California an Unusual Mortality Event (UME) on October 11, 2007. The Working Group has seven criteria they use to define "unusual" and an event must meet one or more. This event was declared on the basis of two of the following criteria: (1) there is a marked increase in the magnitude or a marked change in the nature of morbidity, mortality or strandings when compared with prior records (criterion number one), and (2) potentially significant morbidity, mortality or stranding is observed in species, stocks, or populations that are particularly vulnerable (criterion number 6).

In light of the UME, an onsite coordinator was designated and funds were made available to respond to stranded whales and analyze samples from them. The UME team is collecting information on environmental conditions in the SBC that could assist in determining the cause(s) of observed prey aggregation and distribution during fall 2007 and to provide information for ascertaining the possibility of feeding aggregations in the future. The onsite coordinator will prepare a comprehensive report of the UME that examines those environmental factors and information gained from the necropsies of the examined carcasses.

A background paper providing additional information on blue whale abundance, distribution and ship strikes is attached for your information.

AGENCY DECISION AND ACTIONS

NMFS has carefully reviewed the information available regarding these blue whale deaths and has determined that rulemaking of any kind is not warranted at this time for the following reasons:

CBD's petition asserts that the whales' extended stay (i.e., occurrence in the area longer into the fall than they ordinarily tend to) in the SBC is unprecedented and therefore, NMFS should implement emergency rules to reduce the risk of ship strikes. However, the number of blue whales in the area at this time is much lower than when the petition was submitted, diminishing the need for rulemaking on an emergency basis.

In addition, NMFS does not believe three blue whale deaths in one year rise to the level of emergency rulemaking. While these blue whale deaths are a concern to NMFS, the agency believes this level of mortality, concentrated in a small period, was not substantially greater than annual ship strike-related mortality and injury rates (averaging 0.6 per year for 2000-2004). NMFS believes further that the event is an aberration linked to an unusual distribution pattern, likely caused by an unusually high concentration of prey in and around the SBC.

CBD also asserts that measures are needed similar to those being pursued to protect the North Atlantic right whale in waters off the U.S. east coast. However, that population is more severely depleted than the population(s) of blue whales in waters off the U.S. west coast. The North Atlantic right whale population consists of only 300-400 individuals as compared to blue whale population numbering approximately 3,500 individuals. Confirmed (others likely go undetected) right whale serious injuries and deaths attributed to ship strikes average about 1-2 per year, and therefore, are proportionally greater in the right whale population than the blue whale population(s). Right whale coastal occurrence and distribution near shipping channels is known with greater certainty (due to extensive survey efforts) and is predictable. With regard to the blue whale population there are fewer data, and fewer surveys, to assess abundance and specific shifts in distribution, and therefore, less information on which to craft specific (e.g., rulemaking) measures.

To the CBD's assertion that, in the absence of emergency rulemaking, NMFS should undertake non-emergency rulemaking, NMFS also believes this is unwarranted. NMFS believes the timing

and density of blue whale occurrence in this area is primarily associated with prey aggregations linked to variable oceanographic phenomenon. These conditions could and are likely to change seasonally or annually. As a result, blue whale occurrence in this area is unpredictable. Therefore, promulgating vessel regulations for events that may or may not occur is not warranted without a clearer understanding of the factors that contributed to the blue whale deaths in 2007 and whether they are likely to recur.

Given the uncertainty and variability in prey distribution and the atypical distribution of blue whales this year, NMFS believes the management response executed by the SWR, Channel Islands Marine Sanctuary (CINMS), USCG, and others this year was the appropriate response. It was immediate, flexible, and designed to directly address the threat. Until more is known about contributing circumstances, a regulatory response, in our view, is not appropriate or supported by the best available information. If circumstances similar to those occurring in 2007 recur, or if there are an equal or greater number of blue whale deaths in the future, we will reassess the situation in light of available information and make a decision whether a regulatory response is appropriate. Actions taken in fall 2007 and actions that could be employed to further address this issue are summarized below:

- An Unusual Mortality Event, through NMFS's Working Group on Unusual Marine Mammal Mortality Events, was declared on October 11, 2007;

- Working with the USCG and CINMS, surveys were conducted in the SBC and vicinity for blue whales; and

- With assistance from the National Weather Service, the USCG, and local ports, NMFS advised mariners of the presence of blue whales in Santa Barbara Channel and recommended they transit the channel at 10 knots or less.

We also recommend NMFS:

- Conduct, or encourage, surveys to ascertain blue whale occurrence and distribution in the area;

- Establish criteria (e.g., chlorophyll, prey, blue whale distribution and densities) to assess whether conditions similar to those occurring in 2007 are likely to recur;

- If and when a situation similar to the 2007 event arises, work with the USCG, CINMS and others to issue vessel speed advisories to mariners, and work with other local outlets to warn boaters about blue whale vulnerability to ship strikes;

- Where possible, work with the ports of Los Angeles and Long Beach to extend vessel speed advisories (currently in place to reduce emissions) beyond port reaches; and

- Make every practical attempt to recover and conduct necropsies on blue whale carcasses to determine cause of death.

RECOMMENDATION:

I recommend you (a) concur with my determination to deny CBD's petition to initiate emergency rulemaking, or in the alternative, proposed and final rulemaking, to establish 10 knot speed limits for vessels over 65 feet in the Santa Barbara Channel to protect blue whales from ship strikes, (b) concur with my determination to implement, as appropriate, the recommended measures identified above in future years, and (c) sign the attached Information Memorandum to the VADM Lautenbacher.

1.    I concur. _____    Date: 1/11/08

2.    I do not concur. _____    Date: _____



UNITED STATES DEPARTMENT OF COMMERCE
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, Maryland 20910

THE DIRECTOR

Mr. Brendan Cummings
Center for Biological Diversity
P.O. Box 549
Joshua Tree, California  92252

Dear Mr. Cummings:

This is in response to the Center for Biological Diversity's (CBD) petition to the Secretary of Commerce and NOAA's National Marine Fisheries Service (NMFS) to initiate emergency rulemaking or in the alternative proposed final rulemaking, to set vessel speed limits in the Santa Barbara Channel (SBC) off California to prevent mortality from ship strikes to endangered blue whales.

NMFS has carefully reviewed the information regarding these blue whale deaths and has determined that rulemaking is not warranted at this time.

NMFS does not believe three blue whale deaths in one year rise to the level of emergency rulemaking. While these blue whale deaths are a concern to NMFS, this level of mortality concentrated in a small period was not substantially greater than annual ship strike-related mortality and injury rates (averaging 0.6 per year for 2000-2004). NMFS believes the event is an aberration linked to an unusual distribution pattern, likely caused by an unusually high concentration of prey in and around the SBC. In addition, the number of blue whales in the area at this time is much lower than when the petition was submitted, diminishing the need for rulemaking on an emergency basis.

The CBD asserted that measures are needed similar to those being pursued to protect the North Atlantic right whale in waters off the U.S. east coast. However, that population is more severely depleted than the population(s) of blue whales in waters off the U.S. west coast. The North Atlantic right whale population consists of only 300-400 individuals as compared to blue whale population numbering approximately 3,500 individuals. Confirmed (others likely go undetected) right whale serious injuries and deaths attributed to ship strikes average about one to two per year, and therefore, are proportionally greater in the right whale population than the blue whale population(s). Right whale coastal occurrence and distribution near shipping channels is known with greater certainty (due to extensive survey efforts) and is predictable. With regard to the blue whale population there are fewer data, and fewer surveys, to assess abundance and specific shifts in distribution, and therefore, less information on which to craft specific (e.g., rulemaking) measures.

To the CBD's assertion that, in the absence of emergency rulemaking, NMFS should undertake non-emergency rulemaking, NMFS also believes this is unwarranted. NMFS believes the timing and density of blue whale occurrence in this area is primarily associated with prey aggregations linked to variable oceanographic phenomenon. These conditions could and are likely to change seasonally or annually. As a result, blue whale occurrence in this area is unpredictable. Therefore, promulgating vessel regulations for events that may or may not occur is not warranted without a clearer understanding of the factors that contributed to the blue whale deaths in 2007 and whether they are likely to recur.

THE ASSISTANT ADMINISTRATOR
FOR FISHERIES




Printed on Recycled Paper

Given the uncertainty and variability in prey distribution and the atypical distribution of blue whales this year, NMFS believes the management response executed by the NMFS's Southwest Regional Office, the Channel Islands Marine Sanctuary (CINMS), U.S. Coast Guard (USCG), and others in the fall of 2007 was the appropriate response. It was immediate, flexible, and designed to directly address the threat. Until more is known about contributing circumstances, a regulatory response, in our view, is not appropriate or supported by the best available information. If circumstances similar to those occurring in 2007 recur, or if there are equal or a greater number of blue whale deaths in the future, NMFS will reassess the situation in light of available information and make a decision whether a regulatory response is appropriate. Actions taken in fall 2007 and actions that could be employed to further address this issue are summarized below:

- An Unusual Mortality Event, through NMFS's Working Group on Unusual Marine Mammal Mortality Events, was declared on October 11, 2007;

- Working with the USCG and CINMS, surveys were conducted in the SBC and vicinity for blue whales; and

- With assistance from the National Weather Service, the USCG, and local ports, NMFS advised mariners of the presence of blue whales in the SBC and recommended they transit the channel at 10 knots or less.

NMFS will also consider:

- Conducting or encouraging surveys to ascertain blue whale occurrence and distribution in the area;

- Establishing criteria (e.g., chlorophyll, prey, blue whale distribution and densities) to assess whether conditions similar to those occurring in 2007 are likely to recur;

- If and when a situation similar to the 2007 event arises, working with the USCG, CINMS and others to issue vessel speed advisories to mariners, and work with other local outlets to warn boaters about blue whale vulnerability to ship strikes;

- Where possible, working with the ports of Los Angeles and Long Beach to extend vessel speed advisories (currently in place to reduce emissions) beyond port reaches; and

- Making every practical attempt to recover and conduct necropsies on blue whale carcasses to determine cause of death.

Thank you for your interest in this important matter.

Sincerely,

John Oliver
Acting Assistant Administrator
for Fisheries

**Background Information for
Consideration of a Petition for Emergency Regulations to
Protect North Pacific Blue Whales in Southern California**

## North Pacific Blue Whales

The blue whale (*Baleanoptera musculus*) is a global species. Gambell (1979) identified ten putative stocks of blue whales in the world's oceans. Although there is some information on blue whale stock structure in the North Pacific, it has not been determined with certainty. Gambell (1979) suggested that there were three stocks in the North Pacific - west, central, and east, but the International Whaling Commission (IWC) has considered there to be a single panmictic stock in this ocean basin (Donovan 1991; also see Best 1993). Blue whales inhabit and feed in both coastal and pelagic environments. They are frequently found on the continental shelf (e.g., in areas off the California coast, Calambokidis *et al.* 1990; Fiedler *et al.* 1998) and also deep, offshore waters (e.g., in the northeastern tropical Pacific, Wade and Friedrichsen 1979).

## Eastern North Pacific (California/Mexico) Blue Whale Stock

Blue whales have been observed along the west coast of Baja California between March and July (Gendron and Zavala-Hernàndez 1995). There are indications, based on photo-identification of individuals and of fidelity to certain areas, suggestive of separate stocks, but stock structure is not certain. In typical years, they are first observed in Monterey Bay, around the Channel Islands, and in the Gulf of the Farallons in June and July (Calambokidis *et al.* 1990; Calambokidis 1995). They are fairly widespread and unpredictable in their areas of concentration from August to November. Individuals have been shown to move among the Gulf of the Farallons, Monterey Bay, and Point Arena, California, within years. Also, some of the whales that spend the summer and fall (August-October) off the California coast migrate to Mexican waters, where they have been re-identified by photographs in spring (March-April) (Calambokidis *et al.* 1990).

There is evidence for blue whale distributional shifts related to prey abundance and oceanographic conditions. The appearance of numerous blue whales off the Farallon Islands is noteworthy in light of their rarity in that region prior to the late 1970s (Calambokidis *et al.* 1990). Similarly, shore-based whaling data from Moss Landing and Trinidad, California, for the period 1919 to 1926 indicate that the species was (unlike today) extremely uncommon in this region (Clapham *et al.* 1997). Calambokidis (1995) concluded that such changes in distribution reflect a shift in feeding from the more offshore euphausiid, *Euphausia pacifica*, to the primarily neritic euphausiid, *Thysanoëssa spinifera*.

*Abundance and Trends*

The size of the feeding stock of blue whales in California off the U.S. West Coast was estimated relatively recently by both line-transect and mark-recapture methods (Barlow 1994, Barlow 1995). A mark-recapture estimate, using photo-identification of individuals, is 1,760 (CV=0.32),

but mark-recapture estimates can be somewhat biased. The best estimate of blue whale abundance, using an average of two techniques (photo-identification and line transect), is 1,186 (CV=0.19). By combining this estimate with that from the eastern tropical Pacific, the total eastern North Pacific population south of Oregon can be estimated at about 3,500 whales.

There is some indication that blue whales have increased in abundance in California coastal waters between 1979 and 1980, and 1991. However, this may be due to an increase in the stock as a whole; it could also be the result of an increased use of California as a feeding area. The size of the apparent increase in abundance is too large to be accounted for by population growth alone. The evident scarcity of blue whales in areas of former abundance (e.g., Gulf of Alaska and near the Aleutian Islands; see Calambokidis *et al.* 1990) suggests the increasing trend does not apply to the species' entire range in the eastern North Pacific.

*Distribution and Habitat Use*

Blue whale occurrence and distribution are likely linked to prey distribution and abundance. Blue whales off California and elsewhere in the North Pacific prey mainly on *Euphausids*. The U.S. is certainly one of the most important feeding areas in summer and fall, but, increasingly, blue whales from this population have been observed feeding to the north and south of this area during summer and fall.

*Ship Strikes*

Prior to 2007, ship strikes were implicated in the deaths of blue whales in California. One blue whale was injured as the result of a ship strike in 2003 (blood observed in the water). Between 1998 and 2004, five blue whales were injured and three mortalities of unidentified large whales were attributed to ship strikes. Additional mortality from ship strikes probably goes unreported because the whales do not strand or, if they do, they do not always have obvious signs of trauma. Several blue whales have been photographed in California with large gashes in their dorsal surface that appear to be from ship strikes. The average number of blue whale mortalities and injuries in California attributed to ship strikes was 0.6 per year from 2000 to 2004.

Ship strikes were implicated in the deaths of at least four and possibly six blue whales off California between 1980 and 1993 (Barlow *et al.* 1995; Barlow *et al.* 1997). The average number of blue whale mortalities in California attributed to ship strikes was 0.2 per year from 1991 to 1995 (Barlow *et al.* 1997). Further mortalities of this nature probably have occurred without being reported.

To date, no blue whale mortality has been associated with California gillnet fisheries. Accordingly ship strikes account for the largest number of human caused mortalities of blue whales on the U.S. Pacific coast.

*Potential Biological Removal*

The potential biological removal (PBR) level for this stock is calculated as the minimum population size (1,005) times one half the default maximum net growth rate for cetaceans (½ of 4%) times a recovery factor of 0.1 (for an endangered species which has a minimum abundance

less than 1,500), resulting in a PBR of 2.0. Because this stock spends approximately half its time outside the U.S. EEZ, the PBR allocation for U.S. waters is half of this, or 1.0 whale per year.

**2007 Blue Whale Occurrence and Distribution off Southern California**

Figures 1 and 2 illustrate blue whale distribution in and near southern California shipping channels between September 28 and October 24.

**2007 Recent Blue Whale Deaths and Related Events in Southern California**

In early September 2007, an unusually high number of blue whales were feeding in the Santa Barbara Channel and nearby waters. Between September 8 and September 19, 2007, NOAA received reports of five blue whale carcasses in California's Channel Island area spanning from Santa Cruz Island and just north of San Diego (Table 1; Fig 2). An account of each is contained in Appendix 1. The five reports may constitute three or four individuals as some may be re-sights of the same drifting carcass (e.g., Fig 3). Each had blunt force trauma wounds and/or propeller cuts, consistent with injuries sustained in a collision with a large vessel. In addition, NMFS received reports of two blue whale carcasses on November 29.

**Table 1.**

| Date | Location | Length/Gender | Report by |
|------|----------|---------------|-----------|
| Sept. 8 | Long Beach harbor | 24 m/male | USCG |
| Sept. 11 | S. Barbara Channel | ~23 m/female | researcher |
| Sept. 12 | 25 NE San Clemente Is | *unk.*/male | U.S. Navy |
| Sept. 19 | Ensenda, Mex | 24 m/male | NMFS * |
| Sept. 19 | S. Barbara Channel | 21 m/male | private boater |
| Nov 29 | San Miguel, Is. | 22 m/female | Sanctuary personnel |
| Nov 29 | San Miguel, Is. | 4 m (fetus)/male | Sanctuary personnel |

* may be the same individual as either numbers 1 or 3.

Necropsies were performed on two of these individuals: one on September 14 in Ventura, California; one on September 22, at Point Magu Naval Air Station. Full (draft) necropsy reports are available. The two additional carcasses found on November 29 were evaluated and it was determined the adult had injuries consistent with those sustained in a collision with a large vessel. The calf likely died as a consequence of its mother being struck and killed.

*September 14 in Ventura, California Necropsy*

This was a 24 m female. Among other things, necropsy scientists noted: extensive hemorrhaging into the blubber and muscle below the blubber along the left side of the animal, and a sharp demarcation between bruised blubber and normal blubber approximately two-thirds around the animal. There are hemorrhages in the blubber. They also noted a sharply demarcated linear mark on the skin surface running from the dorsum around the lateral flank approx 1m long

and 15 cms wide at the level of the posterior end of the throat grooves on the left side. There are two notches in the margin of the left pectoral flipper. These injuries are consistent with blunt force trauma associated with ship strike.

*September 22 at Point Mugu Naval Air Station Necropsy*

This was a 21 m sub-adult male. In this case, the cause of death was determined to be a ship strike and those attending the necropsy noted: evidence of ship strike includes comminuted fractures of cranial ribs on the left side, cranial thoracic vertebrae, and caudal skull all with extensive associated skeletal muscle damage and hemorrhage on broken margins implying ante-mortem injury.

**Designation of Unusual Mortality Event**

After consulting with the Working Group on Unusual Marine Mammal Mortality Events, the National Marine Fisheries Service (NMFS) designated the recent blue whale mortalities in southern California an Unusual Mortality Event (UME) on October 11, 2007. Designating this as an event includes designation of an onsite coordinator and makes funds available to respond to stranded animals and analyze samples from them. The UME team is collecting information on environmental conditions is the Santa Barbara Channel (SBC) that are leading to the blue whale feeding aggregation. The onsite coordinator will prepare a comprehensive report of the UME that examines those environmental factors and information gained from the necropsies of the examined carcasses.

**Additional Precautionary Measures**

NMFS has worked with other federal and state agencies to reduce ship strikes in the area. CINMS and the U.S. Coast Guard (USCG.) began surveying the SBC shipping lanes. Those surveys have consistently found blue whales in the shipping lanes. Vessel speed advisories, of 10 knots, were routinely broadcast by the USCG and NOAA.

Figure 1. Locations of blue whale sightings in waters near the southern California Channel Islands, September 28, September 29, and October 1.



Figure 2.  Locations of all blue whale sightings in waters near the southern California Channel Islands through October 24.



Figure 3.  Locations and dates of observed blue whale carcasses.



Figure 4.  Trajectory (drift) of dead blue originally sighted September 11.



Literature Cited

Barlow, J. 1994. Abundance of large whales in California coastal waters: a comparison of ship surveys in 1979/80 and in 1991. Rep. int. Whal. Commn. 44:399-406.

Barlow, J. 1995. The abundance of cetaceans in California waters. I. Ship surveys in summer/fall 1991. Fish. Bull. 93:1-14.

Barlow, J., R.L. Brownell, Jr., D.P. DeMaster, K.A. Forney, M.S. Lowry, S. Osmek, T.J. Ragen, R.R. Reeves, and R.J. Small. 1995. U.S. Pacific marine mammal stock assessments. NOAA Technical Memorandum NMFS-SWFSC-219.

Barlow, J. 1997. Preliminary estimates of cetacean abundance off California, Oregon, and Washington based on a 1996 ship survey and comparisons of passing and closing modes. NMFS, SWFSC Admin. Rept. LJ-97-11. 25 pp.

Barlow, J., K.A. Forney, P.S. Hill, R.L. Brownell, Jr., J.V. Carretta, D.P. DeMaster, F. Julian, M. Lowry, T. Regan, and R.R. Reeves. 1997. U.S. Pacific marine mammal stock assessments: 1996. NOAA Technical Memorandum NMFS-TM-SWFSC-248.

Best, P.B. 1992. Catches of fin whales in the North Atlantic by the M.V. *Sierra* (and associated vessels). Rep. int. Whal. Commn. 42:697-700.

Best, P.B. 1993. Increase rates in severely depleted stocks of baleen whales. ICES J. mar. Sci. 50:169-186.

Calambokidis, J. 1995. Blue whales off California. Whalewatcher 29(1):3-7.

Calambokidis, J., G.H. Steiger, J.C. Cubbage, K.C. Balcomb, C. Ewald, S. Kruse, R. Wells, and R. Sears. 1990. Sightings and movements of blue whales off central California 1986-88 from photo-identification of individuals. Rep. int. Whal. Commn, Special Issue 12:343-348.

Clapham, P.J., S. Leatherwood, I. Szczepaniak, and R.L. Brownell, Jr. 1997. Catches of humpback and other whales from shore stations at Moss Landing and Trinidad, California, 1919-1926. Mar. Mamm. Sci. 13:368-394.

Donovan, G.P. 1991. A review of IWC stock boundaries. Rep. int. Whal. Commn., Special Issue 13:39-68.

Fiedler, P., S. Reilly, R. Hewitt, D. Demer, V. Philbrick, S. Smith, W. Armstrong, D. Croll, B. Tershy, and B. Mate. 1998. Blue whale habitat and prey in the Channel Islands. Deep Sea Research (in press).

Gambell, R. 1979. The blue whale. Biologist 26:209-215.

Gendron, D., and V. Zavala-Hernàndez. 1995. Blue whales of Baja California: a summary of their distribution and preliminary reproductive data based on photoidentification. P. 43 In: Proceedings of the Eleventh Biennial Conference on the Biology of Marine Mammals, Orlando, Florida (abstract). Society for Marine Mammalogy, Lawrence, KS.

Wade, L.S., and G.L. Friedrichsen. 1979. Recent sightings of the blue whale, *Balaenoptera musculus*, in the northeastern tropical Pacific. Fish. Bull. 76:915-919.

Yablokov, A.V. 1994. Validity of whaling data. Nature 367:108.

Yochem, P.K., and S. Leatherwood. 1985. Blue whale *Balaenoptera musculus* (Linnaeus, 1758). Pp. 193-240 In: Ridgway, S.H. and R. Harrison (eds.), Handbook of Marine Mammals, Vol. 3: The Sirenians and Baleen Whales. Academic Press, London. 362 pp.

**Appendix 1. Blue whale deaths reported from Southern California, September 8-21, 2007.**

1. On September 8, the U.S. Coast Guard discovered a dead floating whale inside the West Basin of Long Beach Harbor. The carcass was towed to a dock and secured. Dave Janiger of the Los Angeles County Museum of Natural History (LACMNH) checked out the carcass later in the day and identified it as a male blue whale approximately 72 feet in length. Dave collected a skin sample and some other tissues. There were no external signs of human interaction on the carcass. The carcass was towed out to sea on September 9 by the Long Beach Harbor Patrol. It is assumed the carcass was brought into the harbor on the bow of a large ship, but it is unknown if the animal was alive or dead before it was hit by the ship.

2. On September 11, a permitted whale researcher doing work in the Santa Barbara Channel discovered a dead floating female blue whale approximately 70 feet in length. A biopsy sample was collected from the carcass, and a linear wound on the carcass was observed that may have been indicative of a ship strike. A coordinated effort was undertaken by NMFS Headquarters, NMFS-SWR, U.S. Coast Guard, Channel Islands National Marine Sanctuary, Santa Barbara Museum of Natural History (SBMNH), and the research team, to identify a nearby site where the carcass could be landed for a necropsy. Channel Islands National Park gave us permission to land the carcass on Santa Rosa Island. Due to a strong current and difficulty in securing a vessel capable of towing the carcass to the island, we were unable to intercept the carcass for towing, although we were able to track the carcass on a daily basis. The carcass continued to drift east, towards the mainland, and on September 14, the carcass washed ashore adjacent to Hobson County Park, Ventura County. A necropsy team consisting of Paul Collins, SBMNH, Sam Dover Channel Islands Marine and Wildlife Institute, and Frances Gulland, The Marine Mammal Center, conducted a low-level necropsy and determined that the animal had been struck by a ship, and that ship strike was the primary cause of death (excessive vertebral damage, dorsal & lateral processes broken off lumbar & caudal vertebrae, vertebral column severed in lumbar/caudal region, large hematoma extending from dorsal fin to left front pectoral fin). The carcass was measured at 2400 centimeters (78.7 feet) in length. The skull was collected and will be incorporated into the SBMNH collection. Blubber and skin samples were also collected for analysis. The carcass was buried by the Ventura County Parks Department on September 16.

3. On September 12, the U.S. Navy reported to Headquarters that a dead floating whale was discovered approximately 25 miles northeast of San Clemente Island by one of its vessels. A coordinated effort was undertaken by NMFS' Headquarters, NMFS' Southwest Region (SWR), U.S. Navy, & U.S. Coast Guard, to place a biologist aboard the Navy vessel and conduct an at-sea examination of the carcass. Dave Janiger of LACMNH agreed to check out the carcass & was flown to the Navy vessel via U.S. Coast Guard helicopter on September 14. The carcass could not be found, and after several hours of aerial searching, the mission was aborted. Mr. Janiger and Alyssa Shulman-Janiger, American Cetacean Society examined the photos of the carcass provided by the Navy, and determined that the carcass was a male blue whale of

unknown length.  NOTE:  SWR suspects that this carcass may be the same carcass that was towed out of Long Beach Harbor on September 9, as there have been no other reports of a floating large whale carcass between Long Beach and San Diego. Historically, large whale carcasses towed out of Long Beach Harbor have sometimes washed up on Orange County beaches.

4.  On September 19, NMFS received a report of a 22m (72 ft.) adult male, moderately decomposed, on the beach in Ensenada, Baja California, Mexico.  We believe the carcass was buried.  We have contacted our Mexican colleagues to learn more about the animal, and whether any samples or photographs were taken.  NOTE:  This animal could potentially be a resight of animal number 1 and/or 3; however, experts who have looked at the photographs do not believe it was decomposed enough to be the same animal as was initially seen in Long Beach on September 8.

5.  On September 19, a blue whale carcass was sighted in the Santa Barbara Channel by a private boater and called in to NMFS on September 20.  It was described as 60 to 70 feet in length in "pretty good condition."  Channel Islands National Marine Sanctuary personnel flew to relocate the animal, and it was found approximately 10 miles offshore, minor decomposition (code 2/3).  Oceanographic conditions indicate this animal will not likely strand on the mainland within the next few days, so plans are being made by the stranding network to tow the animal to land for necropsy, which should take place Saturday, September 22.

Other reported mortality (not a blue whale):

On September 16, the U.S. Navy reported to Headquarters that a dead floating whale was observed approximately 15 miles off San Clemente Island.  The animal was reported to be approximately 15 feet in length, body intact, no apparent signs of damage, and no noticeable decomposition.  Unfortunately, no photographs or other samples were taken by the vessel that first observed the animal, and species identification cannot be confirmed.  The Navy deployed assets to attempt to relocate the carcass, and potentially take it to land for necropsy.  The animal was not resighted.

cc:  PR, PR2, PR2-Silber
g/PR2/GREG/Center 4 Biol Div Blue Whale Response. 11 Dec
PR2-Greg Silber, 301-713-2322, ext. 152